CHICAGO CITY BANK & TRUST COMPANY, Trustee, Plaintiff-Appellee, *v.* CERES TERMINALS, INCORPORATED, Defendant-Appellant.

First District (5th Division)    No. 80-686

◼

Opinion filed February 20, 1981.

Lord, Bissell & Brook, of Chicago (Robert A. Knuti, of counsel), for appellant.

Wexler, Siegel & Shaw, Ltd., of Chicago (Stuart Smith, of counsel), for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

This appeal arises from a declaratory judgment action brought by a lessor against its lessee to construe portions of a lease; particularly, the amount of rent to be paid under the lease's renewal clause. The lessee appeals from the trial court's determination that the leased property's value is $1,875,000, contending that this amount is against the manifest weight of the evidence. The lessor cross-appeals from the trial court's finding that it is liable for the real estate taxes on the property. We affirm. The pertinent facts follow.

On February 1, 1957, Manor Real Estate Company leased 18 acres of land to Overseas Shipping, Incorporated. The land is located on the Calumet River at Lake Calumet, north of 130th Street at Stony Island Avenue in Chicago. The land has a deep sea dock that can accommodate ocean-going ships and is accessible via the Calumet Expressway. The initial duration of the lease was 20 years, but a renewal clause enables the lessee to extend the lease for up to four periods of five years each.

In 1975, Manor sold 38 acres of land, which included the 18-acre parcel of the leased property, to Scrap Corporation of America for $1,000,000. Scrap conveyed this property to a trust at Chicago City Bank (plaintiff). Scrap acts as the bank's agent in matters pertaining to the lease and for convenience is referred to as "lessor." Defendant Ceres Terminals, Inc., succeeded to Oversea's interest in the lease through a merger and is referred to as "lessee."

Lessee exercised its renewal option for the period of February 1, 1977, to January 31, 1982. The lease provides that rent for the renewal period is to be determined in the following manner:

"If the Lessor and the Lessee are unable to agree upon the rental for any extended five (5) year period, the value of the premises hereby leased shall be appraised and valued in the following manner:

By one appraiser selected by the Lessor and one appraiser selected by the Lessee, and in the event that the two appraisers do not agree on a valuation of the demised premises, then, and in that event, the said two (2) appraisers shall select a third appraiser or arbitrator, or if they cannot agree upon a third appraiser or arbitrator, then, and in that event, either the Lessor or the Lessee may apply, upon due notice to the other party, to the Circuit Court of Cook County, Illinois for the appointment of such third appraiser, and the valuation agreed upon by either two of three said appraisers shall be considered the valuation of the demised premises and the amount of the rental to be paid by the Lessee for the extended term shall be based on a five (5%) percent net return on such valuation."

Both parties selected appraisers. Lessor employed Jules H. Marling, Jr., who concluded that the value of the full 38 acres was $3,371,000 and the value of the 18-acre leased portion was $2,750,000. Lessee's appraiser, James J. Schroeder, valued the 18-acre leasehold at $925,000. The two appraisers met to discuss their opinions but failed to agree on the value of the property. In accordance with the lease provision, they agreed on a list of possible third appraisers. However, they could not agree as to the procedure that the third appraiser should follow and consequently lessor filed for a declaratory judgment.

The trial court appointed a third appraiser, Theodore R. Kowalski, who assessed the property's value as $1,900,000. The court directed all three appraisers to seek an agreement as to the property's value, and provided that if they could not agree the court would determine the value. Both lessee and lessor agreed to this procedure.

When the three appraisers met, Kowalski suggested a range of $1,600,000 to $1,700,000. However, Marling refused to agree to any amount less than $2,100,000 and Schroeder would not go above $1,280,000. Because of the appraisers' failure to agree, the trial judge set the case for a hearing.

At the hearing, lessee submitted a memorandum which summarized the three appraisals as follows:

|  | MARLING | SCHROEDER | KOWALSKI |
|---|---|---|---|
| Land Value | $ 941,000 ($1.20/sq.ft.) | $ 690,000 ($.80-.90/sq. ft.) | $ 916,000 ($1.25/sq.ft.) |
| Other Improvements |  |  |  |
| Dock | $ 990,000 | Included in Land Value | $ 640,000 |
| Sub-Total | $1,931,000 | $ 690,000 | $1,556,000 |

The common objective of the three appraisers was to determine the leased property's fair market value. All three considered this question from the cost approach, the income approach, and the market data approach. Under the cost approach the estimated depreciated replacement cost of improvements is added to an estimate of the land's value. The income approach involves analysis of the property in terms of its ability to generate a net annual income in dollars, which is then capitalized. Under the market data approach, the particular property is compared with other similar properties which have been sold or are listed for sale. This market data approach was used by all three appraisers to determine the land value component of the total property value.

Although the three appraisers used similar approaches, their estimates of the total land value varied substantially, as the above summary memorandum reflects. It is lessee's ultimate contention on appeal that the trial court adopted an appraisal that did not actually reflect the property's fair market value. To better analyze the pertinent testimony and apply the applicable law, we will first summarize the trial testimony.

*Marling's Testimony*

Marling, a real estate consultant and appraiser since 1969, defined the "highest and best use" of property as that which provides the greatest net return to the property. The best use of the leased property is heavy industrial use which would be affected by the unique aspects of the property, especially its 1800 feet of dock and its proximity to the Calumet Expressway. The most likely user of such property, he testified, would be a steel warehouser, a scrap corporation or another user with requirements for heavy transportation.

Marling concluded that the total value of the property in question as of February 1, 1977, was $2,630,000. Of this total, he figured, $1.20 per square foot represented the land value and $990,000 was attributable to the dock improvement. The dock's value was based on a replacement cost of $1,100 per running foot for 1800 feet with a 50% depreciation factor. Marling described his valuation of the dock as a subjective

determination that he based on his discussions with people regarding the need for and availability of such docks and the potential purchaser's use for a dock facility. Marling acknowledged that very few deep water docks had been constructed in recent years in the Lake Calumet region. He did not investigate recent figures representing tonnage of cargo from deep water vessels in the region. He also conceded that the property would be of use to a limited segment of the industrial market, people who would be willing to pay a high price for use of the dock.

Marling further testified that a barge dock owned by Cozzi Iron contributed $1 per square foot to that property when it was sold for a total of $2.31 per square foot. Marling stated that he did not consider $2.50 per square foot to be too high a value for the leased property in question.

## Schroeder's Testimony

Lessee's appraiser, Schroeder, testified that he had had extensive experience appraising property with water frontage, including land on the Calumet River. He concluded that the total value of the leased property was $925,000. His calculation of the land value included the dock's value, which he felt to be a part of the land rather than an "additive factor." In fixing the value of this land and its seawall improvement, Schroeder considered comparable sales of property on the Calumet River, although he had to adjust for differences in the compared parcels. He found that the 20-acre nonfrontage portion of the 38-acre parcel was worth 65¢ per square foot, and that the total value of the 38 acres, with the added components of the water frontage, dock, and some buildings, was 80¢ to 90¢ per square foot. This he contrasted to Kowalski's appraisal of $2.23 per square foot. Schroeder stated that the reason for the difference in valuation was Kowalski's addition of a $640,000 depreciated value of the dock to his already established land value.

Schroeder further testified that he had discovered that there had been no deep water docks constructed in the region in the previous five years. This was consistent with Kowalski's analysis of depressed land values resulting from the decline in port activity.

## Kowalski's Testimony

In Kowalski's opinion, the total value of the leased property was $1,900,000. Factors in this determination included the "excellent dock facilities that the property enjoys, its prime location for truck and railroad traffic, and its 'excellent soil condition,' suitable for the storage of heavy containers." He stated that he considered it to be "special-use type property inasmuch as it has these various facilities which [are] generally not needed and [are] generally not seen in property in the Chicago area to this intensity." He acknowledged that the market for the property was

limited. He also testified that he had considered comparable sales in appraising the property, citing 10 similar properties he had appraised in various locations, including two in Chicago.

Kowalski valued the property from the cost approach and the market value approach, but found that neither the income approach nor the market approach were the best methods to value the property. He stated that "[t]he general appraisal technique for a special use property is generally the cost approach." He recognized that the best way to value the leased property would be to compare it with a sale of property with similar physical characteristics, but that this was not easy to do because none of the other properties had the same unique characteristics. He stated that he had found no property in the Lake Calumet region that had been sold for over $1.50 per square foot. He concluded that the cost approach was the most appropriate way to value the property.

Three other witnesses testified as to the use of deep water docks at Lake Calumet. They agreed that the number of overseas vessels in the region had declined, as had the tonnage of cargo.

At the close of the evidence the parties reiterated their earlier stipulation that all appraisals would be admitted without objection. The court then announced, "Having given all the testimony and cross-examination due consideration, I find that the valuation of the demised premises is $1,850,000."

On April 3, 1979, there was a hearing on the issue of who was to pay the real estate taxes on the property during the renewal period. The court held that the specific terms of the lease, which required the lessor to pay the taxes, applied to the extension clause also. Lessor argued that the lease is a "net lease," which charges all expenses and taxes to the lessee. Lessee disagreed, maintaining that the specific lease terms require the lessor to pay the real estate taxes, and that this agreement continued under any renewal periods of the lease. The trial court agreed with lessee's position.[1]

OPINION

We first consider whether lessee is estopped from asserting on appeal that the trial court considered improper evidence (the replacement cost of the dock). Lessor maintains that lessee did not object to the admission of any evidence. On the contrary, the parties stipulated that all written appraisals would be submitted for the trial court's evaluation. Therefore, lessor claims that, in view of the principle that a party cannot change its theory or raise new issues on appeal (*Norway Tree Farm, Inc. v. Baugher*

---

[1] The question of which party was responsible for exterior maintenance work on the property's improvements, however, the trial judge refused to consider because "that issue [was] never in the case." In response to the court's refusal to further address this issue, lessee has filed another declaratory judgment action, requesting a ruling as to the right and duties of the parties with respect to the maintenance and repair of the property's improvements, especially dock repairs and exterior maintenance.

(1972), 8 Ill. App. 3d 1061, 291 N.E.2d 237), lessee should be barred from challenging any part of the appraisal evidence.

■■ We do not believe that lessee is raising new matters on appeal. As lessee points out, much of the valuation controversy centers on the amount added to the land's value which is attributable to the deep water dock. The trial transcript reveals that part of lessee's testimony and argument was aimed at the propriety of considering the cost of the dock improvement as a separate component in arriving at the property's overall fair market value. Lessee's stipulation to the admission of the written appraisals cannot be construed as its agreement as to their correctness or to the weight they should be accorded. (See Ill.L. & Prac. *Stipulations* §7 (1958).) Because this was a bench trial, moreover, there was no need for formal action to preserve questions of the sufficiency of the evidence. (Supreme Court Rule 366(b)(3)(i), Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(3)(i).) We conclude that lessee, in challenging the weight that the trial court placed on what is purportedly an erroneous valuation approach, has not waived its arguments or attempted to change its legal theory for this appeal.

## I.

The central issue in this dispute is whether the court's finding of the property's value was erroneous "because of the fundamental mistake of adding to the property value the depreciated replacement cost of an unmarketable deep water dock." According to lessee, the trial court adopted Kowalski's appraisal, which was premised on the "special use" aspects of the property. The flaw in this approach, lessee contends, is that it results in a valuation that does not reflect the property's actual "market value." Both Marling and Kowalski assigned the dock a value, based on its depreciated replacement cost, and then added this amount to the separately calculated land value. Schroeder, in contrast, viewed the dock as part of the land and *included* the dock's value in the total land value. Thus, lessee implies, only Schroeder correctly determined the market value of the property.

We disagree that Kowalski's testimony indicates his rejection of the fair market value standard in favor of an alternative valuation approach. We also reject the argument that the trial court was misled by the cost replacement evidence and consequently arrived at a valuation that was contrary to the manifest weight of the evidence. In evaluating the property's value, all three appraisers employed the same three approaches— cost, income, and market data. It is not disputed that the dock has some economic value; certainly its existence was a consideration in each appraisal. As lessee's counsel stated during his closing argument, "[I]f there is no demand for a deep water dock, then *the value that you add to a property because it has a deep water dock is going to be substantially*

*reduced."* (Emphasis added.) It seems, therefore, that the real problem is to determine whether Marling's and Kowalski's appraisals, as well as the court's judgment, overemphasized the dock's value to such a degree that the $1,875,000 valuation of the leased property completely fails to reflect its "true" market value.

Fair market value has been defined as "the price which property would bring if it were offered for sale by a willing seller to a willing buyer" (*Housing Authority v. Kosydor* (1959), 17 Ill. 2d 602, 606, 162 N.E.2d 357, 359), both parties having full knowledge of all uses to which it is capable of being used. In eminent domain proceedings, the fair market value of land may be unascertainable because it has special capabilities that make it useful primarily to its owner, who would be unable to sell it at its "real" value. For example, churches, school buildings, and railroad terminals are not generally bought and sold on the open market. In condemnation cases involving these "special use" properties, therefore, a standard of compensation other than fair market value may be used, such as replacement cost.

It is Kowalski's characterization of the leased property as "special use" that lessee objects to, contending that he misunderstood his assignment and failed to conform to the agreed-upon objective of ascertaining fair market value. To support its position, lessee cites eminent domain cases which indicate that the fair market value of improved property is not necessarily the sum of the value of land plus its improvements. In *Department of Public Works & Buildings v. Lotta* (1963), 27 Ill. 2d 455, 456-57, 189 N.E.2d 238, 240, the Illinois Supreme Court stated that in valuing improved property the "whole does not necessarily equal the sum of the parts" and that "[t]o avoid * * * confusing the jury, the evidence may properly be confined to the * * * value of the improved land as a whole." In *Central Illinois Public Service Co. v. Gibbel* (1978), 65 Ill. App. 3d 890, 382 N.E.2d 846, it was held that adding the replacement cost of a house to the value of the ground in an eminent domain case was an improper method of valuation. In another eminent domain action, the court held that an appraiser could not add the separate value of extracted sand reserves to the land value of a quarry property; the proper method was to determine how much the existence of such minerals would *enhance* the land's value. *Department of Public Works & Buildings v. Oberlaender* (1969), 42 Ill. 2d 410, 247 N.E.2d 888.

We believe that these eminent domain cases are distinguishable from the situation in the pending case. They involved jury proceedings in which challenges were made to the admissibility of evidence based on the separate valuations of land improvements or, in *Oberlaender,* mineral reserves. To prevent the juries from merely adding up a list of valuation figures, the total of which might not reflect a price that a "willing buyer" would pay for the property, these courts restricted the appraisal testi-

mony to opinions of the value of particular property "as a whole." As our supreme court noted in *Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 363, 356 N.E.2d 13, 19:

"The problem which may occur from the admissibility of such evidence is that the jury may conclude that the market value of the property is the sum of the different values stated by the witnesses. *It may fail to consider the various other factors, such as the real estate market in the area of the property, which a professional appraiser, with his experience and judgment, must weigh in determining the market value.* The trial court, therefore, erred in admitting evidence by the underlying figures used by the appraisal witnesses." (Emphasis added.)

In contrast to the cited cases, the pending action was tried before the trial judge, who sat without a jury. He was in a position to study all the written appraisal data that the three professionals relied upon in determining the fair market value of the leased real estate. He also heard extensive testimony from the appraisers and considered the arguments of counsel. It is presumed, moreover, that a trial court considers only competent evidence. (*People ex rel. Hartshorn v. Hartshorn* (1959), 21 Ill. App. 2d 91, 157 N.E.2d 563.) Without doubt, experienced real estate appraisers may differ in their estimates of the value of particular property (see *Sebree v. Board of Education* (1912), 254 Ill. 438, 98 N.E. 931), and should be accorded substantial latitude in the exercise of their professional judgments. (See *Schipper & Block, Inc. v. Carson Pirie Scott & Co.* (1970), 122 Ill. App. 2d 34, 256 N.E.2d 854.) Appraisal of real estate involves consideration of numerous variables, such as the location of the land, its "best and highest" use, the selling price of comparable parcels, and the unique aspects or improvements which characterize the appraised property. It is unrealistic to expect that similarly qualified appraisers will equally weigh each valuation element that is included in their ultimate appraisals. It is therefore logical that a trial court's acceptance of a particular appraisal will not be set aside unless it is the result of disqualification of the appraiser, fraud, bad faith, or fundamental mistake. See *Schipper & Block v. Carson Pirie Scott & Co.*

The record reflects that all three appraisers in the pending case were qualified and experienced. There is no evidence of fraud or bad faith on the part of anyone. Nor do we find that Marling's and Kowalski's computations of the dock's value constitute "fundamental mistake." As we have discussed, each appraiser followed basically the same three approaches in calculating the property's value. Each considered the selling prices of comparable properties. Kowalski minimized the usefulness of this approach because he believed that none of the comparable properties were sufficiently similar to the instant property. Schroeder used the depreciated cost replacement approach to value the land's

buildings, but included the dock's value in his land estimate. That the appraisers reached different results does not mean that they relied upon improper valuation techniques. Instead, it is evident that the appraisers simply differed in their ultimate opinions of the property's market value.

■■ We cannot conclude, on this record, that the trial court's judgment was against the manifest weight of the evidence or that it was premised upon a fundamental valuation error. Accordingly, we affirm the trial court's determination of the leased property's value.

## II.

Lessor cross-appeals from the trial court's determination that it is obligated to pay real estate taxes on the property during the extension period of the lease. To resolve this issue we must examine two particular provisions of the lease. Article XIII of the original lease provides:

> "For the second year of said term and each succeeding year until the termination of this lease Lessor shall maintain the exterior of all improvements on the demised premises, it being distinctly understood, however, that Lessee shall continue to maintain the interior of the improvements in a manner as above provided during the term of this lease. Lessor shall also assume and pay all general taxes, special assessments and charges against the demised premises for the second and each succeeding year of the term of this lease, and of any extension or renewal thereof."

■■ This section indicates that the court correctly charged lessor with the taxes because the express language obligates lessor to pay them "for the second and each succeeding year of the term of this lease, *and of any extension or renewal thereof.*" (Emphasis added.) However, lessor points to the extension clause language which covers the payment of rent during renewal periods:

> "The Lessee shall have the right at its election to extend this lease of the said premises for four (4), five (5) year succeeding periods beyond the initial twenty (20) year period at a fair and equitable rate of rental * * *.
>
>          * * *
>
> [T]he amount of the rental to be paid by the lessee for the extended term shall be based on a five per cent (5%) net return on such valuation."

According to lessor, the "net return" language of this extension clause indicates that the lease should be treated as a "net lease," as distinguished from a "gross" or "gross heated" lease. A net lease generally puts the burdens of ownership on the lessee, who pays all taxes and operating expenses on the property so that the landowner receives a fixed or "net" rental. (See Van Doren, *Some Suggestions for the Drafting of Long Term*

*and Percentage Leases*, 51 Colum. L. Rev. 186 (1951).) Lessor argues that, although the essential terms of the lease are extended in the renewal period, the payment of taxes and expenses must be considered part of the rent payable by lessee during that period. We disagree.

We need not pronounce an all-encompassing definition of the terms "net" and "gross" as they are applied to leases. The better approach, we believe, is to examine the lease as a whole to determine which rights and obligations are specifically indicated, and resort to general usage or constructive principles only where the lease is silent. Lessor's reliance on *Bournique v. Williams* (1922), 225 Ill. App. 12, is misplaced. The lease in *Bournique* did not delegate the property tax liability to either party. Consequently, the appellate court affirmed the finding that the rental should be "net" to the lessors; that is, lessee would be responsible for taxes and assessments. In contrast, the instant lease explicitly sets out lessor's obligation to pay the taxes during extension periods. The trial court therefore properly concluded that the parties were "bound by the provision of the lease with respect to taxes, [which] shall not be a consideration for the payment of rent."

The evidence adduced at the hearing on this issue supports the trial court's judgment. One witness testified as to the common usage of the phrases "net lease," "gross lease," and "gross heated lease," but conceded that he did not know whether the terms had the same usage in 1956, when the lease was being negotiated. The lawyer who drafted the original lease also testified. He identified various preliminary drafts of the lease and identified the final version, to which the words "and of any extension or renewal thereof" had been added. The final witness, a long-time employee of lessee, testified that he did not recall lessee ever paying property taxes, but that it paid the specific expenses detailed in the lease, such as insurance, utilities, and maintenance. He testified that those expenses were paid "in addition to" the rent.

■■ We conclude that the trial court's determination of the property tax issue is supported by the evidence and by the rule of construction that "[w]here in an agreement there are general and specific provisions relating to the same thing, the special provisions control." *Olson v. Rossetter* (1947), 330 Ill. App. 304, 313, 71 N.E.2d 556, 560, *aff'd* (1948), 399 Ill. 232, 77 N.E.2d 652.

For the foregoing reasons, we affirm the trial court's judgment in its entirety.

Affirmed.

SULLIVAN and LORENZ, JJ., concur.