411 So.2d 221 (1982)
LEVITZ FURNITURE COMPANY OF the EASTERN REGION, INC., a Florida Corporation, and Levitz Furniture Corporation, a Pennsylvania Corporation Authorized to Transact Business in Florida, Appellants,
v.
CONTINENTAL EQUITIES, INC., and American Casualty Company of Reading, Pennsylvania, Appellees.
Nos. 79-1067, 79-2013 and 80-504.
District Court of Appeal of Florida, Third District.
February 16, 1982.
Rehearing Denied April 5, 1982.
*222 Blackwell, Walker, Gray, Powers, Flick & Hoehl and James E. Tribble and James C. Blecke, Miami, for appellants.
Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel D. Eaton, Greene & Cooper and Robyn Greene, Miami, for appellees.
Before HENDRY, SCHWARTZ and NESBITT, JJ.
SCHWARTZ, Judge.
In 1971, Continental Equities, Inc., the owner of vacant land in Dade County, agreed to construct a furniture warehouse and showroom[1] and to rent the thus-improved premises to the Levitz Furniture Company on a "net lease" basis. On May 9, 1973, about one year after the building was completed and Levitz had taken possession, a substantial portion of the roof and supporting walls collapsed. About two weeks after that, the county building department required the evacuation of the entire building because of its discovery of dangerous construction defects which extended well beyond the immediate area of the collapse. The order was complied with at once. Under an arrangement with Continental reserving their respective rights, Levitz repaired the building, at a cost of over $1,000,000, and reoccupied the premises in December, 1973.[2]
Levitz then instituted this litigation against Continental, among others, to recover the damages sustained, inter alia, by way of lost profits, stock, and the expenses required to repair the building. Continental counterclaimed for the full amount of the rent required by the lease for the entire period in question. There was extensive, though disputed, evidence developed in discovery that the collapse and the ensuing orders of the county to evacuate and repair were the result of latent construction defects in the building which existed, but were neither discovered nor discoverable, when Levitz took possession. Nonetheless, the trial court entered summary judgment for the landlord both on its counterclaim for the full rentals under the terms of the lease  over $1,200,000  and dismissing Levitz' complaint for damages. These rulings were based on the theory that, under the lease agreement and as a matter of law, Continental was not liable in any way for any latent defects in the building it agreed to construct and was therefore entitled to the rental agreed upon without regard or deduction for the facts that the defects resulted in great expense to the tenant and even its inability to use the demised premises.[3] We disagree with this conclusion and reverse for trial.
The landlord's potential responsibility[4] for latent defects is based upon two legal *223 principles, which coalesce in their clear application to this case.
First, it is a well-settled and well-founded rule of law that when, as here, the parties enter into a lease agreement with respect to a building which is to be constructed or is as yet uncompleted, an implied warranty or covenant arises that the completed structure will be suitable for the lessee's intended use. Woolford v. Electric Appliances, Inc., 24 Cal. App.2d 385, 75 P.2d 112 (1938); Swift v. The East Waterloo Hotel Co., 40 Iowa 322 (1875); Panagos v. Fox, 310 Mich. 157, 16 N.W.2d 700 (1944); J.D. Young Corp. v. McClintic, 26 S.W.2d 460 (Tex.Civ.App. 1930), rev'd on other grounds, 66 S.W.2d 676 (Tex.Comm.App. 1933) (landlord liable to tenant for damage to furniture store caused by leaky roof in building under construction at time of lease); American Law of Property § 3.45 (A.J. Casner ed. 1952) ("[W]here the lessee is restricted to a particular use and accepts the lease before the premises are completely constructed or altered, the courts have held that there is an implied covenant that the property will be suitable for the purpose for which leased."); 2 R. Powell, The Law of Real Property § 225[2] (rev. ed. P. Rohan 1981); Restatement (Second) of Property § 5.2, Comment e (1977). The landlord's claim that this rule is not in accordance with the Florida law is incorrect. The authorities relied upon, primarily Butler v. Maney, 146 Fla. 33, 200 So. 226 (1941) and Brooks v. Peters, 157 Fla. 141, 25 So.2d 205 (1946), hold only that there is no warranty of prior inspection or against latent defects in the entirely different case of an already completed structure and therefore have "no application to the question here presented." Woolford v. Electric Appliances, Inc., supra, at 75 P.2d 113.[5]
Moreover, the landlord's contractual undertaking to erect the building, see note 1, supra, itself gave rise to an obligation, enforceable by Levitz as the contracting party, that it perform that agreement with reasonable care. Holbrook v. City of Sarasota, 58 So.2d 862 (Fla. 1952); Banfield v. Addington, 104 Fla. 661, 140 So. 893 (1932). It is also the case that, since such a contractually-assumed duty is a nondelegable one, it does not matter, despite the appellee's contrary argument, whether the defective work was actually done by the general contractor hired by Continental to discharge its obligation or by a subcontractor engaged by the general. Mills v. Krauss, 114 So.2d 817 (Fla.2d DCA 1959), cert. denied, 119 So.2d 293 (Fla. 1960).[6]
Of course, the parties were free to have contracted for a negation or modification of the effects of these rules of law. Our review of their extensive and elaborate agreement reveals, however, that they did not.[7] To the direct contrary, the lease contains an affirmative recognition of the existence of Continental's continuing obligation for the proper construction of the building. Paragraph 22 states
POSSESSION AND MAINTENANCE
22. Tenant, by taking possession thereof, will be deemed to have acknowledged that the demised premises, with all appurtenances, were in good order and condition when received by Tenant, latent *224 defects excepted. [emphasis supplied][8]
The "latent defects" exception would be meaningless if, as the landlord contends, there is no pre-existing responsibility for such defects. Thus, the very presence of this provision demonstrates the unsoundness of its basic position. Furthermore, by its very terms, it disposes of Continental's argument that Levitz waived any claim with respect to defective construction by taking possession of the building. In this regard, paragraph 22 merely tracks and expresses the law, as established by Slavin v. Kay, 108 So.2d 462 (Fla. 1959) and its numerous progeny, that acceptance does not terminate responsibility for a latent defect which, by definition, could not have been discovered by a reasonably careful inspection. That this principle is also controlling in this situation, even were there no paragraph 22, is shown by Restatement (Second) of Property, supra, see § 5.3, Comment e:
If the tenant at the time of entry neither knows nor should have known of the condition of the leased property that creates the unsuitable condition, his entry does not constitute a waiver of any remedies. In that case, he will have a reasonable time after learning of the unsuitable condition to notify the landlord to cure the unsuitable condition.
Continental's ultimate argument is that, because it entered into a "net lease," an arrangement supposedly designed to secure the landlord a guaranteed return on its investment, the rentals should not be reduced in any way or for any reason from those provided in the agreement. This argument is basically a fallacious one, since it attempts to deduce the legal effect of an instrument from what it is called, rather than from what it says and does. Walls v. Endel, 20 Fla. 86 (1883). As the court pointed out with respect to this very question in Chicago City Bank & Trust Co. v. Ceres Terminals, Inc., 93 Ill. App.3d 623, 630, 49 Ill.Dec. 108, 115, 417 N.E.2d 798, 805 (1981):
We need not pronounce an all-encompassing definition of the terms "net" and "gross" as they are applied to leases. The better approach, we believe, is to examine the lease as a whole to determine which rights and obligations are specifically indicated, and resort to general usage or constructive principles only where the lease is silent.
See also Howard, The Essential Elements of a Net Lease, 8 The Practical Lawyer 15, 16 (1967) ("... there is no such thing as a standard or typical form of Net Lease. Each lease, whether it be gross or net, must be `tailor-made' to fit the requirements of the particular business transaction.") As has already been demonstrated, this particular contract certainly does not preclude and, in a significant aspect, paragraph 22, actually reinforces the determination that general principles of landlord responsibility are applicable to this transaction.
Even on its own terms, however, the landlord's contention does not bear analysis. A "net lease" is essentially one
which shifts the burdens of ownership, for a stated period, from the landowner to the occupant, and reserves to the owner during that period a net return on his investment. [emphasis supplied]
Van Doren, Some Suggestions for the Drafting of Long Term Net and Percentage Leases, 52 Colum.L.R. 186 (1951). The fact that the net tenant, as under this lease, must pay all taxes, insurance and other expenses required during the term of the leasehold does not affect the landlord's obligation *225 with respect to its essentially separate and preterm undertaking to build its potential tenant a building that may be used for the purposes specified.[9] See Railway Express Agency, Inc. v. Commissioner of Taxation, 307 Minn. 245, 239 N.W.2d 245 (1976). The appellee's position is that it was entitled to the full prescribed rental for a building it agreed to and did construct, even though it was so defective that it fell down and the tenant, for a long period, could not use it.[10] There is nothing in the law, in the agreement, nor in net lease theory[11] which requires the acceptance of what is, on its face, such an astonishing contention.
For the reasons stated,[12] the orders under review are reversed and the cause remanded for further proceedings not inconsistent with this opinion.
Reversed and remanded.
HENDRY, Judge, dissenting.
I respectfully dissent. I believe the loss should properly fall on Levitz for three reasons: (1) the lease demonstrates that the parties intended to place the risk of loss on the tenant; (2) the facts and circumstances surrounding the transaction require the loss to be borne by the tenant; (3) Florida law does not support the majority's finding of an implied warranty of fitness for commercial losses of this nature.
An absolutely net lease of this type is essentially a sophisticated financing technique intended to make the tenant the owner of the property. The tenant's "rent" is akin to traditional mortgage payments. This financing technique provides an alternative to the outright purchase by the tenant of the property. In fact, the tenant assumes and discharges substantially all the risks and obligations normally attributed to the outright ownership of the property. Albenda & Lief, Net Lease Financing Transactions Under The Proposed Bankruptcy Act of 1973, 30 The Business Lawyer 713, 714 (1975). See also Howard, The Essential Elements of a Net Lease, 8 The Practical Lawyer, Issue No. 2, 15, 16 (1962). Thus, the tenant agrees to pay
all taxes, water rates, sewer charges, assessments, charges of any other kind, whether ordinary or extraordinary, carry insurance, fire and extended coverage, liability insurance and perhaps earthquake insurance ... make all repairs, rebuild the building if it is destroyed in whole or in part, regardless of whether there was any insurance coverage ... [e.s.]
Williams, The Role of the Commercial Lease in Corporate Finance, 22 The Business Lawyer 751, 752 (1967). In other words, the tenant will do everything so that the fixed cash rental payable by the tenant will be, as the phrase is sometimes put, "absolutely net."
This concept and phrasing is more than coincidental to the present case, for paragraph eight of the Levitz lease states:

*226 [I]t is the purpose and intent of Landlord and Tenant that the rent hereinabove to be paid to Landlord by Tenant be absolutely net to Landlord, so that this Lease shall, except as herein provided to the contrary, yield net to Landlord the rent as herein provided, to be paid in each year during the term of this Lease, and that all costs, expenses and obligations of every kind or nature whatsoever, relating to the demised premises, or any improvements thereon, which may arise during the term of this lease, shall be paid by Tenant.
In contrast to the majority decision, I do not believe the lease provided "to the contrary" that Continental assumed responsibility for the loss which occurred. It is true that paragraph 22 stated that Levitz acknowledged the building was in good order "latent defects excepted," but that proviso was plainly not a warranty by Continental. Indeed, paragraph 22 was clearly superceded by paragraph 3 of the supplemental agreement executed by Levitz after the building was complete and Levitz had taken possession. For in paragraph 3 of the subsequent agreement, Levitz specifically "accepted" the building subject to the absolutely net lease under which it assumed responsibility, inter alia, for:
1. "All costs, expenses and obligations of every kind or nature whatsoever..." [paragraph 8].
2. All unanticipated construction costs [paragraph 4].
3. All other costs and expenses of the building [paragraph 7].
4. All costs generated by laws or governmental orders [paragraph 7].
5. All utilities and taxes [paragraph 15].
6. All insurance [paragraphs 19 and 21].
7. All "costs of restoration" in the event of casualty [paragraph 19].
8. All costs of repairs in the event of damage to the building [paragraph 22].
9. All costs of "alterations, major repairs or improvements" [paragraph 24].
The agreement thus plainly intended to place all the responsibilities of ownership[1] on Levitz, clearly stating that "all costs, expenses and obligations of every kind or nature whatsoever ... shall be paid by Tenant."
For these reasons, the "latent defects" proviso in paragraph 22 cannot be construed as a warranty. In view of the supplemental agreement, paragraph 22 can only be interpreted as placing the risk of latent defects on Continental during the construction period, until the building was completed, inspected and "accepted" by Levitz. At that time the risk of latent defects shifted to Levitz.
The omission of a reservation for latent defects from the supplemental agreement after Levitz has previously reserved such rights in paragraph 22 of the lease (where possession alone is acknowledged) should lead to the conclusion that even if an implied warranty of fitness existed initially, it terminated upon acceptance of the premises.[2] Any other construction renders paragraph *227 3 of the supplement meaningless and ignores the parties' obvious intent to enter into an absolutely net lease.
The majority has also completely avoided any mention of the fact that Levitz has already obtained recovery from its insurer in the approximate amount of $1,750,000 for the loss. Such conduct corresponds with the parties' intent, as indicated by the above-cited provision, to create a net leasing arrangement. As unmistakably required by the lease agreement, Levitz purchased a policy of "all risks insurance" to cover precisely the loss which occurred in this case. In other words, despite Levitz' attempt to shift the loss which it agreed to bear (and thus insured against) onto Continental, Levitz has already been made whole exactly as the parties contemplated. Although Levitz insists its reimbursement is irrelevant, I believe the recovery confirms the parties' intent that Levitz bear the risk of loss. Under the absolutely net lease terms of the agreement, the loss has thus fallen exactly where both parties assumed it would. In this posture, should Levitz win on remand, it (or in the alternative, its insurance company) will receive an unjustified windfall, a fact which the majority fails to note.
Aside from the terms of the agreement, the parties' intent and the fact that Levitz has already recovered on its loss, Florida law simply does not recognize an implied warranty of fitness with respect to commercial buildings. The majority fails to cite even one Florida case in support of its theory that an implied warranty of fitness arises in a net leasing arrangement between sophisticated businessmen.[3] Nor should Florida law shift the risk of loss to the lessor, when the very purpose of such commercial leases is to place the risk on the tenant:
Under a Net Lease, if the improvements on the property are damaged or destroyed by fire or other casualty, the tenant should not have the right (and should waive any rights that it may have under the law) to cancel its lease except, possibly, where the damage or destruction is extensive, and the event occurs during the last few years of the lease term. .. . In the event of such cancellation, the tenant should assign all of the insurance proceeds to the landlord. If the lease continues, it is the obligation of the tenant to restore the premises to their former or other agreed-upon condition. This is so regardless of whether the loss is or is not covered by insurance, whether the insurance proceeds are or are not adequate, and whether or not the particular hazard was even insurable. In short, the tenant under a Net Lease is itself an insurer of the improvements on the leased premises, under every conceivable contingency. To the extent that the tenant can shift all or any part of the risk to an insurance company, it may do so, but the primary responsibility always rests upon the tenant. [emphasis supplied]
Howard, The Essential Elements of a Net Lease, 8 The Practical Lawyer, Issue No. 2, 15, 19-20 (1962). Note that the loss here did not occur during the last years of the lease, but rather at the very beginning.
Finally, I believe the majority has overlooked certain facts and thus relied on inapplicable legal precedent. The majority states that it is "well-settled" that an implied covenant arises with respect to a lease *228 for a building yet to be constructed, but ignores the fact that this tenant was actually in control of the construction of its own building: the construction was supervised by Levitz' own architects and engineers and was built according to plans and specifications supplied by Levitz. This plus the fact that Levitz moved into the building prior to completion placed it in at least an equal position to know of any latent defects. For this reason the majority's reliance upon Restatement (Second) of Property, § 5.3, Comment 3 (1977) is misplaced.
Because I find that no genuine issue of material fact exists, I would affirm the summary judgment entered below for Continental.
NOTES
[1] The paragraph states:

IMPROVEMENT OF DEMISED PREMISES
3. Landlord shall, at its own cost and expense, forthwith improve the demised premises by constructing thereon a warehouse, showroom, and office building according to plans and specifications to be prepared for Tenant at Tenant's cost and expense, by William C. Webb and Associates, Inc., from preliminary plans and specifications supplied by Tenant... .
[2] Subsequent to that time, the agreement also provided for Levitz to make, without prejudice, monthly rental payments less than those required by the lease. It made no payments at all during the several-month period in which it was unable to occupy the building.
[3] A later order, also on review, granted attorneys' fees to Continental under a contract provision which permitted such an award whenever it successfully maintained an action under the lease. Our reversal of the underlying judgments to that effect requires, of course, a reversal of this order as well.
[4] We emphasize that we do not pass upon the factual questions of whether such defects existed; the extent to which, if they did, Levitz was or should have been on notice of them; or the effect of any such actual or imputed knowledge. While Continental did not establish its right to a summary judgment based on any of these issues, Holl v. Talcott, 191 So.2d 40 (Fla. 1966), they remain open for resolution at trial.
[5] We note also that, with respect at least to housing, Brooks v. Peters has been overruled by Mansur v. Eubanks, 401 So.2d 1328 (Fla. 1981).
[6] To the extent that, on these facts, the implied warranty of fitness of the completed building and the duty imposed by the construction contract may be differentiated, it is clear that the nondelegability rule applies to the former as well. See Ferguson v. Westinghouse Electric Corp., 408 So.2d 659 (Fla.3d DCA 1981); Easton v. Weir, 125 So.2d 115 (Fla.2d DCA 1960), cert. denied, 129 So.2d 141 (Fla. 1961).
[7] The lease contains a requirement that the tenant carry $10,000 in property damage liability insurance. It is clear, and not even the appellee really asserts otherwise, that this provision  which probably refers only to protection against claims, say, for damages to customers' automobiles  does not conclusively establish the intention of the parties to shift the risk of losses of the nature in question here from the landlord to Levitz or its carrier. See Fairchild v. W.O. Taylor Commercial Refrigeration and Electric Co., 403 So.2d 1119 (Fla. 5th DCA 1981).
[8] A supplement, executed well after completion, stated in part:

3. LANDLORD has completed the improvements to the demised premises contemplated by said Lease Agreement, as well as said additional improvements; and TENANT has accepted and taken possession of the demised premises, as modified, together with said improvements.
Continental strenuously argues that this statement abrogates the effect of paragraph 22. This contention is wholly without merit. The statement did no more than acknowledge that the building had in fact been completed and accepted. It had nothing to do with the legal consequences of that acceptance, including the lack of effect upon any liability for "latent defects," as set forth in the primary agreement.
[9] This view is entirely consistent with the clause upon which Continental most heavily relies.

8. Subject to the provisions of paragraph 16 hereof, it is the purpose and intent of Landlord and Tenant that the rent hereinabove provided to be paid to Landlord by Tenant be absolutely net to Landlord, so that this Lease shall, except as herein provided to the contrary, yield net to Landlord the rent as herein provided, to be paid in each year during the term of this Lease, and that all costs, expenses and obligations of every kind or nature whatsoever, relating to the demised premises, or any improvements thereon, which may arise during the term of this lease, shall be paid by Tenant. [emphasis supplied]
The defects involved here did not "arise during the term of this lease," but rather before the term ever commenced. And, in any case, this provision is ineffective to shift the burden of the landlord's own fault in the building's construction to the tenant. Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equipment Co., 374 So.2d 487 (Fla. 1979).
[10] We regard this claim, with respect to the structure, as equivalent to, and equally unacceptable as one that Continental would be entitled to the rent in full even if it did not have title to the underlying realty and the tenant was therefore evicted from the property.
[11] If there is such a thing.
[12] We need not discuss and express no opinion upon any of Levitz' other contentions and arguments.
[1] The lease is for a term of thirty years and contains a provision granting options to renew the lease for four successive five-year periods. Levitz' parent corporation also has an option to purchase the property and building at any time after the expiration of five years for an amount equal to approximately the value of the land in 1971 plus the money invested in the building by Continental. The practical effect of this is that all additional capital improvements made to the property by Levitz during the term of the lease will inure to the benefit of Levitz if it exercises its option to purchase. And, it will most likely exercise this option since the value of the land and building now exceeds the option price due to tremendous appreciation of property values in this area since 1971.
[2] Slavin v. Kay, 108 So.2d 462 (Fla. 1958) cited by the majority is entirely consistent with the conclusion I would reach. Slavin considered the respective liability of a motel owner and plumbing contractor for injuries to a guest resulting from latent defects in installation of a wash basin. There, the owner was held not liable on a directed verdict because of a lack of evidence of negligence in failing to discover the defect, the rationale being that the contractor's negligence is the proximate cause of the injury. Here too, the roof collapse is the result of negligence on the part of the contractor or architect  not Continental, and as will be pointed out, Levitz was in at least an equal (if not actually superior) position to discover the condition of the building.
[3] As the majority recognizes, Mansur v. Eubanks, 401 So.2d 1328 (Fla. 1981) is limited in application to residential housing, and even that limited application may be modified by agreement of the parties. The distinction drawn between complete and incomplete buildings for the majority's conclusion that Butler v. Maney, 146 Fla. 33, 200 So. 226 (1941) has no application to this case is simply not supported by the facts. The reason for the absence of such warranty where the building is already completed is because of the ability of the tenant to find the defect. So too, here, where the tenant was intimately involved with the building's construction (for reasons to be discussed infra) and moved in prior to completion, there is no rationale for finding a warranty. Rather, the tenant here was far more likely to find any defects than Continental itself.