576 So.2d 340 (1991)
Louis D. ATCHLEY, Appellant,
v.
FIRST UNION BANK OF FLORIDA, Appellee.
No. 90-673.
District Court of Appeal of Florida, Fifth District.
February 14, 1991.
Rehearing Denied March 21, 1991.
*341 Jason G. Reynolds, of Coble, Barkin, Gordon, Morris & Reynolds, P.A., Daytona Beach, for appellant.
Robert Ginsberg, Daytona Beach, for appellee.
W. SHARP, Judge.
Atchley appeals from a final summary judgment entered by the trial court which denied him any remedy against the First Union Bank, appellee, either for breach of contract or for negligent roof repairs made pursuant to a contract to sell real estate. The bank entered into a standard-form contract to sell a residence to Atchley, acting in its capacity as the personal representative of an estate which owned the residence. Because we think there were material questions of fact as to the scope of the bank's contractual duties to repair the roof of the residence in question, and whether the repairs were properly made, we reverse. Holl v. Talcott, 191 So.2d 40 (Fla. 1966).
The object of the sale was a thirty "some" year old residence located in Daytona Beach. In a prior contract negotiation with another prospective buyer, the bank and broker learned about various water and termite damage in the house's attic, roof boards, rafters and joists. They told Atchley about the damage and gave him a copy of the termite report prepared for the bank by Bug Master.
The parties then altered the standard form contract to address this problem by deleting Paragraph "N."[1] This provision *342 would have required the seller to warrant there was no visible evidence of leaks from the roof or walls ten days before closing, and if there were, the provision would have required, but capped, the seller's duty to pay up to three percent of the purchase price for repairs  here, a limitation of $1,500 based on a $50,000 contract price.
In lieu of that provision, the bank or its broker drafted the following addendum:
Property is to be purchased in `as is' condition excepting the roof and roof structure and other termite damage areas as mentioned in the attached termite report.

The termite damage areas as mentioned are to be repaired or replaced by a licensed contractor at the seller's expence [sic].
Both parties agree to the holding of closed funds in escrow until such time as the repairs have been completed and that an inspection by a qualified building inspector certifies the roof and roof structure as being structurally sound.
Final contract price and terms to be approved by court and the First Union Nationa [sic] Bank real estate committee. (emphasis added)
The Bug Master termite report was attached to the contract. It is a hand-written summary of areas in the residence where the inspector had found rot and subterranean termites. With regard to the roof and roof structure, the inspector wrote there were termites in two "rafter tails same side  attic  subterranean tube everywhere, at least 10 to 12 ceiling joist [sic] have damage, some braces, some roof boards, several joist [sic] mostly minor damage. Rafter tail north side over oil tank... ."
The bank hired Frank E. Flagg Construction Co., Inc. to make the repairs. Flagg, in turn, hired Cheesbro Roofing, Inc. to complete the roof repairs after their carpenters tore out the damaged roof supports and roof boards and replaced them with new lumber. In order to replace the roof boards, Flagg had to remove roofing tiles, the ninety-pound sheeting, the felt layer and the pine boards in two places on the roof, each about sixty square feet in size.
After the repairs were completed, Bennett, a licensed roofing inspector, certified that the Flagg repairs were "adequate," that the building was "structurally sound" and all termite damage had been repaired. There was also evidence in the record that the residence had serious leaks before the repairs were made, but afterwards the leaks became even worse. Nevertheless, the trial court ruled that the bank had completed all of its obligations under the contract and that, because Flagg was an independent contractor, the bank was not liable for any repairs which might have been performed in a negligent fashion. Looking at the record in a manner most favorable to Atchley (as we must do)[2] we think there exists a material dispute concerning the extent and scope of the bank's repair duties under the contract, and its liability for Flagg's repairs, if they were improperly or negligently performed, even though Flagg is an independent contractor.
With regard to the scope of the bank's duties under the contract, the language employed by it as drafter is far from clear. In such a situation any doubt or question concerning its interpretation should be resolved against the bank as drafter. McClure v. Montgomery, 556 So.2d 759, 760 (Fla. 1st DCA 1990); Westinghouse Electric Corp. v. Prudential Ins. Co. of America, 547 So.2d 721, 722 (Fla. 1st DCA 1989); Regency Highland Associates v. Sherwood, 388 So.2d 271, 273 (Fla. 4th *343 DCA 1980), rev. denied, 397 So.2d 778 (Fla. 1981).
The bank takes the position that its only duty under the contract was to repair the termite damage and obtain a certificate from a qualified inspector that the roof and roof structure are "structurally sound." In the bank's view, the fact that the leaks continued after the repairs were made, and even substantially increased, makes no difference. A "structurally sound" roof may leak.
Atchley argues that more than a mere certificate of soundness is required by the contract. The roof and roof structure must in fact be "structurally sound." How can it be said that a roof is "sound" if it leaks like a sieve?
Depositions in the record make Atchley's position a plausible one. He testified he thought the addendum required the bank to put the roof and roof structure in such a condition that the water leaks would be largely corrected. The termite report attached to the contract described wood damage caused by water rot as well as termite damage. Both problems were mentioned in the contract and were sought to be repaired by Flagg. If the roof had to be replaced rather than patched in order to make it "sound," the contract language was broad enough to encompass Atchley's understanding.
Flagg's vice-president and foreman, O'Neal, testified in his deposition that when his carpenters removed the tile from the roof and he examined the condition of the sheeting, he discovered it was dried out and cracked. He told the bank it was "one of the worst I ever saw"; and that there was no way he could merely patch the roof and guarantee it would not continue to leak. He even got a bid from Cheesbro to put on a new roof. Another contractor consulted by the bank had also suggested a new roof rather than patching because of the age of the roof and the fact that it was a tile roof. However, the bank directed Flagg to do the best it could with the patch job.
Klein, an independent roofing inspector, also gave a deposition supporting Atchley's position. He testified that it would have been impossible to patch the tile roof as was attempted here. "You've got to take the whole section off and patch that area from the top to the bottom. You can't just go up there and patch one little area, like that man did... ." He also testified that although the roof support structure was "sound," the roof itself was "shot."
We thus conclude that the contract language describing the bank's duties to replace and restore the roof and roof structure was unclear and ambiguous. It did not clearly limit those duties to repairing just the termite damage and producing a certificate of "soundness." Based on this record, it could be concluded that the repairs themselves substantially increased water intrusion through the roof. There is commonsense to Atchley's view, as well as record support, that a "sound" roof does not leak extensively, and if the termite damage repairs could not be made without damage to the roof, it should have been replaced. The scope and meaning of the addendum presented a question of fact, as to the parties' intent, which should not have been resolved by summary judgment.
Further, we disagree with that portion of the appealed summary judgment, which ruled the bank could not be held liable for the roof repairs if they were improperly done, because Flagg was an independent contractor. The general rule that a employer is not liable for the torts of an independent contractor hired by him to do specific work, is subject to many exceptions. One, which applies here, is when the employer specifically undertakes, pursuant to a contract, to do something for another.[3]
This is sometimes called the category of "nondelegable" duties. What is actually meant, however, is that although the duty to perform may be delegated to an *344 independent contractor, the liability for misfeasance cannot be avoided by the person who obligated himself originally to perform the contract. Atlantic Coast Development Corp. v. Napoleon Steel Contractors, 385 So.2d 676 (Fla. 3d DCA 1980). Because the bank expressly contracted to repair or replace the roof and roof structure, so as to make them "structurally sound," it is not shielded by the independent contractor doctrine, in the event Flagg made those repairs in an inadequate or negligent fashion. See Mills v. Krauss, 114 So.2d 817 (Fla. 2d DCA 1959), cert. denied, 119 So.2d 293 (Fla. 1960); Levitz Furniture Co. of Eastern Region, Inc. v. Continental Equities, Inc., 411 So.2d 221 (Fla. 3d DCA), rev. denied, 419 So.2d 1196 (Fla. 1982); Fisherman's Paradise, Inc. v. Greenfield, 417 So.2d 306 (Fla. 3d DCA 1982).
Accordingly we reverse the appealed summary judgment and remand for further proceedings consistent with this opinion.
REVERSED and REMANDED.
PETERSON and GRIFFIN, JJ., concur.
NOTES
[1] Paragraph "N" provided as follows:

INSPECTION, REPAIR AND MAINTENANCE: Seller represents that, as of 10 days prior to closing, the roof (including the fascia and soffits) and walls do not have any visible evidence of leaks or damage and that the septic tank, pool, all major appliances, heating, cooling, electrical, plumbing systems and machinery are in working condition. Buyer may, at Buyer's expense, have inspection made of said items by an appropriately licensed person dealing in the construction, repair and maintenance thereof and shall report in writing to Seller such items that do not meet the above representations, together with the cost of correcting same, prior to occupancy or not less than 10 days prior to closing, whichever occurs first. Unless Buyer reports such deficiencies within said period Buyer shall be deemed to have waived Seller's representations as to deficiencies not reported. In the event repairs or replacements are required, Seller shall pay up to 3% of the purchase price for such repairs or replacements by an appropriately licensed person. However, if the cost for such repairs or replacements exceeds 3% of the purchase price, Buyer or Seller may elect to pay such excess, failing which either party may cancel this Contract. In the event Seller is unable to correct the deficiencies prior to closing, the cost thereof shall be paid into escrow at closing. Seller agrees to provide utilities service for inspections upon reasonable notice. Between Effective Date and the closing, Seller shall maintain Property and Personalty including but not limited to the lawn and shrubbery, in the condition herein represented, ordinary wear and tear excepted. Buyer shall be permitted access for inspection of Property, prior to closing in order to confirm compliance herewith.
[2] Wills v. Sears, Roebuck & Co., 351 So.2d 29 (Fla. 1977); High v. Westinghouse Electric Corp., 559 So.2d 227, 229 (Fla. 3d DCA 1989); Greene v. Kolpac Builders, Inc., 549 So.2d 1150, 1151 (Fla. 3d DCA 1989); Williams v. Bevis, 509 So.2d 1304, 1305-06 (Fla. 1st DCA 1987); Weinstein v. General Acc. Fire & Life Assurance Co., 141 So.2d 318 (Fla. 1st DCA 1962).
[3] 2 Fla.Jur.2d Agency and Employment § 111 at 280-281 (1977); 41 Am.Jur.2d "Independent Contractor" § 48 at 816-818 (1968).