635 N.E.2d 485 (1994)
256 Ill. App.3d 836
200 Ill.Dec. 146
CERES TERMINALS, INC., Plaintiff, Counter-defendant, Appellant, and Cross-Appellee,
v.
CHICAGO CITY BANK AND TRUST CO. as Trustee under Trust No. 10062, Defendants, Counter-plaintiffs, Appellees.
No. 1-91-0085.
Appellate Court of Illinois, First District, Fifth Division.
March 31, 1994.
As Amended on Denial of Rehearing May 13, 1994.
*487 Robert A. Knuti, Hugh C. Griffin, Pamela Moore-Gibbs, Diane I. Jennings, Lord, Bissell & Brook, Chicago, for appellant.
Stuart Smith, Gordon & Glickson P.C., Chicago, for appellee.
Justice GORDON delivered the opinion of the court:

BACKGROUND
In 1957, the predecessor in interest of appellant Ceres Terminals, Inc. (Ceres) entered into a 20-year lease for approximately *488 16 acres of waterfront property with the predecessor in interest of defendants-lessors (defendants). Under a renewal clause contained in the lease, Ceres was allowed to extend the lease after the initial 20-year period for four 5-year periods. Under this lease, the amount of rent to be paid during these 5-year periods was to be based on a 5% "net" return of the property's fair market value as determined by appraisers of the parties.
Ceres exercised its renewal option for the period between February 1, 1977, and January 31, 1982. After the parties failed to agree on a fair market value of the land, defendants filed a declaratory judgment action in the circuit court. In 1979, after hearing testimony from three appraisers, Judge Dunne found that the subject property had a fair market value of $1,850,000 for purposes of calculating the rent. In Chicago City Bank and Trust Co. v. Ceres Terminals, Inc. (1981), 93 Ill.App.3d 623, 49 Ill.Dec. 108, 417 N.E.2d 798, the appellate court affirmed that ruling, stating that that valuation was not against the manifest weight of the evidence.
On September 5, 1979, while the appeal from Judge Dunne's determination was pending, Ceres filed a complaint for declaratory relief seeking a declaration that defendants must perform all necessary maintenance and repairs including repairs to docks and warehouses located on the property. Defendants filed a counter-complaint seeking damages in the amount of the cost of repairs.
On March 20, 1981, defendants informed Ceres that the lease would be terminated as of January 31,1982, because Ceres had failed to timely renew the lease for the next five-year period (1982-87). In October 1981, Ceres amended its declaratory judgment complaint to add a second count which sought specific performance to enforce the lease renewal option for the next five-year period.
Defendants filed a motion for summary judgment with respect to the second count of Ceres' complaint. On May 10, 1982, the trial court granted summary judgment in favor of defendants on that count finding that Ceres had not exercised its renewal option in a timely manner. Ceres appealed this ruling and in Ceres Terminals, Inc. v. Chicago City Bank and Trust Co. (1983), 117 Ill.App.3d 399, 72 Ill.Dec. 860, 453 N.E.2d 735, the appellate court affirmed the trial court.
Ceres remained on the subject property after January 31, 1982 (the date the lease expired), while awaiting the trial court's determination on the validity of its attempt to renew the lease for the 1982-87 period. Ceres continued to occupy the property after the trial court entered the May 10, 1982, summary judgment in favor of defendants pursuant to a stay granted by the appellate court. Under that stay order, Ceres continued to pay rent to defendants during this period and filed a $200,000 appeal bond. Ceres subsequently vacated the property on March 15, 1984, after the appellate court affirmed the trial court's decision and the supreme court denied Ceres' petition for leave to appeal.
In April 1985, defendants filed a motion in which they sought increased rent for the period of the stay (February 1, 1982 to March 14, 1984), claiming that Ceres' monthly rental payments during that period were below the fair rental value of the property. Defendants then filed an amended counter-complaint for damages resulting from Ceres' alleged failure to make certain repairs to docks and warehouses on the property. This was apparently the same relief it sought in its original counter-complaint which the trial court had not yet decided. After a bench trial on these claims, "during which appraisal evidence on the property's value was heard, the trial court entered a judgment against Ceres for $151,593.75 in increased rent and $54,500 in damages for repairs to two warehouses on the property. Ceres filed this appeal from that order and defendants cross-appealed.
On appeal, Ceres argues that the defendants should have been barred under the doctrine of judicial estoppel from introducing appraisal evidence of the property's market value because they had previously appeared before the Tax Board of Appeals and represented that the subject property's fair market value was substantially less during the period in question. Ceres also contends that *489 the trial court used the wrong measure of damages in determining its liability for the failure to make the warehouse repairs. In their cross-appeal, defendants argue that the trial court erred in: (1) finding that the annual rental did not include the expense of the applicable property taxes; (2) undervaluing the subject property when determining its fair market value; and (3) awarding increased rent for only 11 acres of the 16 acres Ceres purportedly occupied. For the reasons set forth below we affirm in part and reverse in part.

FACTS

A. Factual History
In 1957, Ceres' predecessor in interest, Overseas Shipping Inc., entered into a lease to occupy approximately 16 acres of real estate located on the shore of Lake Calumet at Stony Island and 130th Ave. (the subject property). This lease was entered into with Manor Real Estate, a subsidiary of Pennsylvania Central Railroad (Penn Central) as lessor, for an initial term of 20 years and included an option to renew for 4 successive 5-year terms. The renewal clause of the lease provided that:
"The Lessee shall have the right at its election to extend this lease of the said premises for four (4) Five (5) year succeeding periods beyond the initial twenty (20) year period at a fair and equitable rate of rental. * * *
If the Lessor and the Lessee are unable to agree upon the rental for any extended five (5) year period, the value of the premises hereby leased shall be appraised and valued * * * and the amount of the rental to be paid by the Lessee for the extended term shall be based on a five percent (5%) net return on such valuation."
In 1975 at a time when Penn Central was in bankruptcy, Manor Real Estate sold the 38-acre tract of land which included the subject property to Calumet Harbor Properties, a partnership comprised of members of the Pinkert family for $1,000,000. The 38 acres were divided into two parcels. The first parcel was approximately six acres in size and did not include any waterfront property. The second parcel covered approximately 32 acres and included the subject property which was at that time being occupied by Ceres pursuant to the 1957 lease Overseas Shipping had entered into with Manor Real Estate. The 32-acre parcel was bisected by a railroad easement with Ceres occupying the property north of the railroad tracks. One-half of this easement, approximately 2.38 acres, covered land which was leased to Ceres. The property occupied by Ceres also contained an 85,000 square foot wooden warehouse and a 55,000 square foot metal warehouse and 1,800 feet of lineal seawall. The property south of the railroad tracks was not waterfront property and did not contain any improvements. With respect to maintenance on the improvement and property taxes, the 1957 lease provided:
"For the second term of said term and each succeeding year until the termination of this lease Lessor shall maintain the exterior of all improvements on the demised premises, it being distinctly understood, however, that Lessee shall continue to maintain the interior of the improvements in a manner as above provided during the term of this lease. Lessor shall also assume and pay all general taxes, special assessments and charges against the demised premises for the second and each succeeding year of the term of the lease, and of any extension or renewal thereof."
In 1975, Calumet Harbor Properties put the property into a land trust with Chicago City Bank and Trust Co. (Chicago City Bank) serving as land trustee and Calumet Harbor Properties as beneficiary. Also in 1975, Calumet Harbor Properties leased out the entire 38 acres to Scrap Corporation of America (Scrap), a company which was also owned and controlled by the Pinkert family. That lease was subject to Ceres' 1957 lease wherein Ceres would still occupy the 16-acre site, but thenceforth would pay its rent to Scrap. The remaining acreage was to be used by Scrap for its metal processing business. In January 1976, Ceres exercised its option under the 1957 lease to renew the lease for an additional five-year term, extending its occupancy until January 31, 1982.
In 1977, the Pinkert family sold 50% of their interest in Scrap to Tang Industries *490 (Tang). Calumet Harbor Properties, acting through Chicago City Bank, then entered into a second lease with Scrap as the lessee for the six-acre parcel and the portion of the 32-acre parcel that was not occupied by Ceres. This was a 40-year lease with an annual rent of $80,000. Under the terms of this lease, Scrap was expressly made liable for all the real estate taxes, maintenance and insurance on the property.
Ceres and defendants could not agree on the proper interpretation of the lease option renewal procedure which was designed to value the property so as to calculate the rental rate for the 1977-1982 period and accordingly defendants filed suit in the circuit court seeking a determination on the proper amount of rent. In 1979, Judge Dunne found the property to be valued at $1,850,000 for the period between 1977 and 1982.
Applying the 5% figure contained in the renewal clause, Judge Dunne calculated Ceres' rent for that period at approximately $7,812 a month. The trial court rejected defendants' claim that Ceres was obligated to pay the property taxes during the 1977-82 period under the renewal clause's "net" lease language. Ceres appealed this ruling and the appellate court affirmed the trial court in Chicago City Bank and Trust Co. v. Ceres Terminals, Inc. (1981), 93 Ill.App.3d 623, 49 Ill.Dec. 108, 417 N.E.2d 798, concluding that the trial court's valuation of the property was not against the manifest weight of the evidence. With respect to the property tax issue, the appellate court determined that the trial court's refusal to require Ceres to pay the property taxes was supported by the evidence and the lease provision, quoted above, which specifically allocated that burden to defendants during any period in which the lease was extended.
On October 1, 1979, during the pendency of the appeal from Judge Dunne's ruling, Ceres filed this declaratory judgment action seeking a declaration that defendants must perform all necessary maintenance and repairs on the premises, including repairs to docks and warehouses located on the property. The defendants filed a counter-complaint seeking damages in the amount of the cost of repairs.
In March 1981, defendants informed Ceres that they considered the lease to be terminated effective January 31, 1982, because Ceres had failed to timely exercise the renewal option clause for the next five-year period (1982-1987). In October 1981, Ceres amended its declaratory judgment complaint to add a second count which sought specific performance on the lease renewal option for the 1982-87 period.
In December 1981, the Pinkert family sold the remainder of Scrap Corp. to Tang and a subdivision of Tang, National Material Corporation (National Material). In December 1982, the subject property was also sold under an installment contract to National Material for $1.3 million. The last payment on the contract for this sale was made by National Material in 1986.
On February 1, 1982, the trial court entered an order providing that "the acceptance of rent by defendant after January 31, 1982 shall be without prejudice and defendant shall not waive any of its rights by accepting said rent." On May 10, 1982, the trial court entered summary judgment against Ceres on count II of its complaint, finding that Ceres did not exercise its right to renew the lease for the 1982-87 period in a timely manner. The trial court did not rule on count I of Ceres' complaint or defendants' counter-complaint, which both sought damages from the other resulting from the failure to maintain the docks and warehouses located on the property.
After obtaining appropriate Rule 304(a) language on the May 10,1982, order granting defendants summary judgment on count II, Ceres filed a notice of appeal. In an order entered on July 13, 1982, the appellate court granted a stay pending the appeal of the May 10,1982, order. Pursuant to that order, Ceres remained on the property, but was required to file an appeal bond in the amount of $200,000. From February 1, 1982, throughout the pendency of that appeal, Ceres continued to pay defendants $7,812 per month in rent. Defendants accepted these payments pursuant to the February 1, 1982, order previously entered by the circuit court.
*491 In 1982 and 1983, defendants filed complaints before the Tax Board of Appeals (Board) seeking reduction of the assessed valuation of the property. To their complaints, defendants attached an appraisal of the property's value completed by Neil Renzi whom they retained for that purpose. This appraisal represented that the fair market value of the 32-acre parcel was $1,020,000. The Board subsequently reduced the assessor's valuation for the entire 32-acre parcel, which was based on a fair market value of $1,579,735, to a valuation based on a fair market value of $1,196,653.[1]
In August 1983, this court in Ceres Terminals, Inc. v. Chicago City Bank & Trust Co. (1983), 117 Ill.App.3d 399, 72 Ill.Dec. 860, 453 N.E.2d 735, affirmed the trial court's May 10, 1982, order which granted summary judgment in favor of defendants on count II of Ceres' complaint. In so doing, the appellate court determined that Ceres had failed to exercise its option to renew the lease for 1982-87 period in a timely manner. After the appellate court's mandate issued on January 6, 1984, Ceres sent two more rent payments of $7,812 to National Material which accepted those payments without protest. Ceres subsequently notified National Material that it had vacated the property as of March 15, 1984.
In April 1985, defendants filed a motion for the "enforcement of the judgment and execution on the appeal bond." In their motion, defendants sought increased rent for the period from February 1, 1982, to March 15, 1984, claiming that Ceres' payment of $7,812 per month was below the rental value of the property. Defendants also filed an amended counter-complaint seeking damages from Ceres' for its failure to make certain repairs to the docks, a wooden warehouse, and a metal warehouse which were located on the property. This was the same relief it sought in its original counter-complaint filed in response to count I of Ceres' declaratory judgment action, which was not addressed by the trial court in the original action. A bench trial was held on the issues of the rental value of the property for the period from February 1, 1982, through March 15, 1984, and the damages resulting from the failure to maintain the improvements on the property.
B. Trial Testimony
Neil Renzi testified on behalf of Ceres that he was a real estate appraiser and consultant. He assessed the value of the 32 acres at $1,020,000 as of January 1,1981, for defendants in connection with their property tax claim. In making that appraisal he considered the highest and best use of the property and analyzed the city and the local neighborhood trends. His appraisal employed the three traditional approaches to property valuation, the cost approach, the sales comparison approach, and the income capitalization approach. He stated that the absolute net rental value of the 32-acre property was estimated at $109,180 per year. Renzi acknowledged his valuation of the property would be affected if 1.5 acres of the property were underwater.
On cross-examination, Renzi confirmed that he considered the property's water frontage in assessing its value. He stated that a long-term or onerous lease would affect the market value of the property. Renzi stated that while computing the cost approach valuation, he considered the value of improvements on the land including buildings, a fence, and a rail spur. He concluded that the surrounding property had a relatively stable demand from industrial users. He admitted that he was not aware of Judge Dunne's 1979 valuation of the 16 acres occupied by Ceres at $1,850,000. Later on re-direct, Renzi, after reviewing his appraisal, stated that in analyzing the property he took into account that the property contained a dock.
David Kunkel, an appraiser who worked at the direction of Renzi, testified that he examined the subject property for purposes of preparing that appraisal. He said that he *492 did not remember if any of the property leased to Ceres was underwater when he inspected it and confirmed that he would have noted so in his appraisal. Kunkel said that factor would affect his valuation of the property.
Joel Monarch next testified that he served on the Tax Board of Appeals where he heard and decided appeals from property tax assessments. He stated that in deciding defendants' appeal with respect to the subject property, he did not visit the property, but reviewed the Renzi appraisal which was submitted with the complaint. Monarch confirmed that he recommended that the total assessed value of the property be reduced from $631,894 to $478,661. He explained that in 1983, industrial property was assessed at 40% of its fair market value. He stated that based on this formula, the pre-appeal original fair market value of the property was $1,579,735 and that its value was reduced to $1,196,653 as a result of the appeal.
On cross-examination, Monarch confirmed that his testimony pertained to the land value of the 32-acre tract and that he did not consider improvements when he spoke of it. He averred that to render a fair assessment it was important to bring the assessment into uniformity with the values imposed on similar properties in the surrounding area.
Gary Garside was called next by Ceres. Garside testified that he was the attorney who filed the real estate assessed valuation complaint on behalf of Scrap at the request of Dale Pinkert. He identified the complaint and stated that it contained a figure of $1,020,000 for the entry of the owner's estimate of the fair market value of land and its buildings. Garside said that he arrived at this figure because of Renzi's appraisal, which was also presented to the Tax Board of Appeals.
Kaare Eileraas, a vice-president of Ceres, testified that Scrap was using approximately 20% of the property leased to Ceres for storage of its scrap metal and equipment. Ceres also submitted a letter sent by Eileraas, dated March 26, 1982, complaining of the storage of Scrap material and equipment on property leased to Ceres and a letter sent by Scrap in response, dated April 2, 1982, acknowledging such use by it of the property. Scrap's responsive letter provided that it would move the equipment off the property, but reminded Ceres that they "frequently provide services for each other without charge in the spirit of good neighbor relations." Ceres also submitted invoices it sent Scrap which sought $52,000 for Scrap's use of land leased to Ceres. The use of a portion of the leased tract was also corroborated by photographic evidence.
Defendants first called Dale Pinkert, who handled the business matters underlying this case on behalf of the Pinkert family and their business entities, Calumet Harbor Properties and Scrap Corporation. Pinkert testified that he considered the following factors relevant when he made his offer to buy the property in 1975: that Penn Central was in bankruptcy and was selling the property off for cash, replacement costs for the dock, that the ports of Chicago were trying to purchase the property, the amount of warehouse space, and the property's access to a deep water port. He stated that in 1975 he obtained an appraisal from Jules Marling who estimated the value of the property at $3 million. Pinkert stated that he did not believe that the value of the property changed between 1975 and 1982.
According to Pinkert, Ceres did not perform any maintenance on the property after January 31, 1982. He obtained an estimate for repairs to the two warehouses from Podcor Construction. These estimates indicated that the necessary repairs to the interior of the metal warehouse included among other things the replacement of damaged steel columns, miscellaneous electrical work, and the replacement of metal siding. The necessary repairs to the interior of the wooden warehouse included among other things work on damaged braces, electrical work and the installation of a new plywood enclosure. These repairs, however, were never made.
William McCann, a professional real estate appraiser, testified next on behalf of defendants. Over objection, McCann opined that the fair cash market value of the property leased by Ceres was $1,829,500 as of February 1982. McCann explained that in valuing *493 the property he did not use either the income or cost approach to the property, but rather the market approach. He defined "market value" as "the amount of money that a property would bring if exposed in the open market, allowing a reasonable length of time to find a buyer who bought with full knowledge of all the uses to which the property was adaptable and capable of being used and assuming that neither the buyer nor the sellers are under any duress to transact."
McCann stated that his valuation of the land considered the existing structures and land improvements, including 1,800 linear feet of sea wall, the rail spur, one building in poor condition and one building in fair condition. He testified that while he did not attribute specific values to each of the improvements on the property, he considered the land and the improvements together as a unit. He concluded that the value of the property north of the railroad tracks was $2.50 per square foot. In reaching this figure, he considered that the property contained 1,800 lineal feet of sea wall. He further noted that the property had access to the Calumet Expressway, was serviced by rail siding, and was zoned for heavy manufacturing. McCann testified that he also considered the sales and leases of surrounding properties and the valuation rendered by Judge Dunne in 1979.
McCann opined that the fair annual rate of rental return was a 12% "net" rate which he computed to be $219,480 based on his estimation of the property's fair market value. McCann defined net rental as "the net amount of money that in [his] opinion the owner or the landlord should receive wherein the lessee, the tenant, pays the real estate taxes, insurance, maintenance and normal expenses of use and occupancy."
McCann said that the value of the land was stable from February 1,1977, until February 1, 1982. He agreed with Renzi's assessment that the immediate area of the subject property had a relatively stable demand for industrial users, but stated that his valuation approach differed from Renzi's in that Renzi's appraisal did not list or consider one of the property's most important individual components, the seawall, which could not be duplicated for less than $1,800,000.
On cross-examination, McCann conceded that if 1.5 acres of the property were underwater that fact would reduce the usable area of the property and correspondingly decrease its rental value. McCann testified that he would not reduce his valuation based on the railroad easement because a tenant is generally charged for an area encumbered by an easement for a rail spur track. He acknowledged that the wooden warehouse was in "poor condition" during the period in issue (1982-84) and could not be used for the storage of any materials that had to be kept dry and secure. He also conceded that in his view, it would be proper to consider demolishing the building before expending funds for its repairs. He confirmed that the wooden warehouse had been demolished sometime before 1988. McCann, however, denied that the condition of an unusable warehouse would bring down the value of the property.
C. Trial Court's Decision
In determining that the fair market value of the usable acreage occupied by Ceres was $1,400,000, the trial court rejected Ceres' claim that defendants were judicially estopped from claiming a higher property value than they claimed before the Tax Board. The trial court purported to base its valuation on:
"consideration of expert valuation in this proceeding; the collateral finding of another judge of the court in the action brought to determine the value of the premises upon the exercise of the option on the last renewal of the lease; the evidence of the valuation evidence presented in various efforts to reduce the real estate taxes; the appraisals obtained and the actual contract sale price agreed upon in the December, 1982 sale of the Penn Dock property to National Material Corporation; and all the other evidence offered and properly received herein." Record at 973.
In so finding, the trial court determined that only 11 of the 16 acres covered in the 1957 lease were usable. Specifically, the trial court found that 1.5 acres of the land had been submerged underwater as the result of *494 dock construction in 1959. In addition, the trial court reduced the amount of usable space by 2.38 acres, one-half of the area occupied by the railroad easement that bisected the 16 acres occupied by Ceres and the other portion of the 32-acre tract which was occupied by Scrap. The trial court further reduced the amount of acreage occupied by Ceres by 1.8 acres, the area occupied by the wooden warehouse which Ceres could not use. The trial court found that no specific figure or percentage could be computed for Scrap's "purported" use of land which was leased to Ceres and therefore refused to reduce the usable acreage on that basis.
The trial court found that based on the 11 usable acre's market value of $1.4 million and a "12%" return, Ceres owed $14,000 a month in rent for the 25½ month period from February 1, 1982, to March 15,1984. In its calculations, the court refused to increase Ceres' rent to reflect the property tax expenses which were incurred by defendants as an addition to the 12% return. Thus, in this respect, the 12% figure was effectively a "gross" return, rather than a "net" return. Pursuant thereto, the court determined that Ceres owed $151,593.75 in increased rent after deducting the rent already paid by Ceres during that period ($7,812 a month).
The trial court also found that Ceres was liable for $54,560 for interior repairs to the warehouses. With respect to defendants' claim for damages resulting from Ceres' failure to perform interior repairs to the wooden and metal warehouses, the trial court found that when Scrap purchased the property in 1975 both warehouses were in need of repair. In assessing the damages, the court stated that by 1982 the failure to repair the roof of the wooden building, which was defendants' responsibility under the terms of the lease, "rendered it basically unusable for its intended warehouse purpose." The trial court determined that those "repairs or maintenance that may have been the responsibility of the tenant during the effective period of Ceres lease and which was not performed, did not cause any damage to or diminution in value of the Subject Property."
The trial court entered a final judgment against Ceres in the amount of $206,153.75. Ceres appeals from this judgment and defendants have filed a cross-appeal.

OPINION
In its appeal, Ceres argues that the trial court erred in permitting defendants to introduce evidence of the subject property's fair market value. Ceres contends that defendants were precluded by the doctrine of judicial estoppel from advancing the position that the market value of the 16 acres was $1,829,000 for the period from February 1, 1982, to March 15, 1984, when defendants previously claimed before the Tax Board of Appeals that the entire 32-acre parcel had a value of $1,020,000 for the years 1982 and 1983. Ceres also contends that the trial court erred in awarding damages pursuant to the supersedeas bond it posted while its appeal of the trial court's May 10,1982, order was pending as that bond limited the recoverable damages to those "proximately caused" by Ceres' stay. Finally, Ceres contends that the trial court erred in awarding $54,500 for damages to the interior of the two warehouses because these repairs were never made and the damages did not diminish the fair market value of the property.
In their cross-appeal, defendants argue that the trial court erred in failing to include the expense of the real estate property taxes when establishing Ceres' liability for rent owed between February 1, 1982, and March 15, 1984. They contend that the trial court's calculations were based on a 12% "gross" rate of return on the fair market value of the property instead of a 12% "net" return, which would have considered the property taxes. Defendants also assert that the trial court erred in valuing the subject property at $1,400,000 and in reducing the amount of useable acreage occupied by Ceres from 16 to 11 acres.

CERES' APPEAL

A. Judicial Estoppel
The equitable common law doctrine of judicial estoppel prevents a party from asserting inconsistent positions before courts in separate proceedings in order to receive favorable judgments in each proceeding. (U.S. v. McCaskey (5th Cir.1993), 9 F.3d 368; Giannini v. First National Bank of Des *495 Plaines (1985), 136 Ill.App.3d 971, 91 Ill.Dec. 438, 483 N.E.2d 924; Finley v. Kesling (1982), 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112.) The application of this doctrine serves to limit "the prospect that an adept litigant may succeed in proving a proposition in one suit and, then succeed in proving the opposite in a second." (18 Charles A. Wright, Federal Practice and Procedure § 4477 (1981).) At its heart, this doctrine prevents chameleonic litigants from "shifting positions to suit the exigencies of the moment" (Cashmore v. Builders Square, Inc. (1991), 211 Ill.App.3d 13, 18, 155 Ill.Dec. 742, 569 N.E.2d 1353; Mijatov v. Graves (1989), 188 Ill.App.3d 792, 136 Ill.Dec. 123, 544 N.E.2d 809), engaging in "cynical gamesmanship" (Teledyne Industries, Inc. v. N.L.R.B. (6th Cir.1990), 911 F.2d 1214, 1218) or "[h]oodwinking" a court. (Kale v. Obuchowski (7th Cir.1993), 985 F.2d 360, 361.) As the Seventh Circuit explained,
"Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process. [Citation.] It is to be applied where `intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice,' [citation], to prevent litigants from `playing fast and loose with the courts.' [Citation.] Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.' [Citation.] The doctrine of estoppel is intended to protect the courts rather than the litigants." In re Cassidy (7th Cir.1990), 892 F.2d 637, 641.[2]
Generally, judicial estoppel is flexible and not reducible to a pat formula. (Czajkowski v. City of Chicago (N.D.Ill.1993), 810 F.Supp. 1428.) The application of this doctrine is within the sound discretion of the court (In re Cassidy, 892 F.2d at 642; Scott v. Land Span Motor, Inc. (D.S.C.1991), 781 F.Supp. 1115), and should not be used where to do so would result in an injustice. (In re Cassidy, 892 F.2d at 642.) Although the elements of this doctrine vary between, as well as within jurisdictions (see Rockwell International Corp. v. Hanford Atomic Metal Trades Council (9th Cir.1988), 851 F.2d 1208; Muellner v. Mars, Inc. (N.D.Ill.1989), 714 F.Supp. 351; Comment, Judicial Estoppel Beating Shields Into Swords and Back Again, 139 U.PA.L.Rev. 1711, 1756-1759 (1991)), Illinois courts have generally set forth the following five elements as necessary to assert successfully the doctrine of judicial estoppel:
"(1) the two positions must be taken by the same party; (2) the positions must be taken in judicial proceedings; (3) the positions must be given under oath; (4) the party must have successfully maintained the first position, and received some benefit thereby; and (5) the two positions must be `totally inconsistent.'" (Parisi v. Jenkins (1992), 236 Ill.App.3d 42, 53-54, 177 Ill.Dec. 496, 603 N.E.2d 566.)
See Galena Park Home v. Krughoff (1989), 183 Ill.App.3d 206, 131 Ill.Dec. 810, 538 N.E.2d 1366; see also Muellner v. Mars, Inc., 714 F.Supp. at 356-57; People v. Wisbrock (1991), 223 Ill.App.3d 173, 165 Ill.Dec. 334, 584 N.E.2d 513; Finley v. Kesling, 105 Ill.App.3d at 9, 60 Ill.Dec. 874, 433 N.E.2d 1112.
Defendants assert that the doctrine of judicial estoppel is inapplicable in this instance. They claim that judicial estoppel will only bar testimony where the party itself has testified under oath in the course of prior proceedings. According to defendants, the mere submission of a real estate appraisal to the Tax Board was insufficient to preclude them *496 from offering evidence of the property's market value at trial when they never testified to the property's value under oath.
We agree with defendants that the trial court did not abuse its discretion in refusing to invoke the doctrine of judicial estoppel. First, the invocation of judicial estoppel here is predicated on the appraisal and valuation of the property's fair market value offered by Neil Renzi. This representation was an opinion on the market value of the property, not a representation of a fact. (See 28 Am. Jur.2d Estoppel and Waiver § 71 at 702 (1966) ("[n]or does an estoppel arise from prior testimony which * * * is a mere matter of opinion").) Unlike statements of fact, "opinions typically reflect the speakers then current state of mind and are inherently variable, they cannot be estopped." (Comment, Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel, 80 NW. U.L.Rev. 1244, 1262 (1986) [hereinafter Precluding Inconsistent Statements].) Consequently, courts have determined that representations on matters of opinion are insufficient to support the invocation of the doctrine of judicial estoppel. (See United States v. Siegel (N.D.Ill.1979), 472 F.Supp. 440, 442 n. 4 (the doctrine of judicial estoppel "does not apply where the prior statement is merely an expression of opinion or legal conclusion"); United States v. Certain Land and Interests in Property (M.D.Tenn.1964), 225 F.Supp. 338, 341 ("prior statements * * * will not be binding if shown to have been mistakenly or inconsiderately made, or if they were merely expressions of opinion or legal conclusions"); see also Comment, Judicial Estoppel: The Refurbishing of a Judicial Shield, 55 Geo. Wash.L.Rev. 409, 411 n. 11 (1987) (the "circuits agree that judicial estoppel does not apply when the inconsistency is one of opinion or of legal theory").) The basis for this rule appears to lie within the aforementioned inherently variable nature of opinions. As explained,
"Opinions, by nature, never can be truly inconsistent because implicit in every expression of opinion is the proposition that the expression is only a reflection of the then-current state of mind and is subject to change at any time. This implied forewarning eliminates the possibility of future inconsistency. For example, if a coroner testifies in trial A that in his opinion the cause of death was natural, and then in trial B testifies that in his opinion the cause of death was murder, there is no true inconsistency because it is generally understood that opinions may change. There would, however, be a true inconsistency if in trial B the coroner testified that at the time of trial A his opinion was that the cause of death was murder. The difference in this situation is that the content of the coroner's opinion at any given time is a fact, irrespective of any future change in that opinion." Precluding Inconsistent Statements, 80 NW.U.L.Rev. at 1262 n. 132.
The estimation of a property's fair market valuation is by its very nature an opinion, not a representation of fact. Certainly, there are some indicators of a property's fair market value which could be considered factual representations, including the amount of taxes paid on the property or the price at which the property was last sold. Unlike those readily ascertainable factual matters, a general estimation of the property's valuation considers numerous intangible factors which could be weighed and combined in a wide variety of ways and analyzed under several different approaches each with a correspondingly different result. This type of inherently variable opinion testimony does not readily provide the basis for the invocation of the doctrine of judicial estoppel. In addition to the above cited authorities see generally 31 C.J.S. Estoppel § 122 at 652 ("estoppel will not arise from former testimony where it was merely an expression of current opinion"); DeMers v. Roncor, Inc. (1991), 249 Mont. 176, 814 P.2d 999 (party not judicially estopped from subsequently taking a different position as to the true interpretation of a written instrument when its first position was an opinion as to the law of the contract and not a declaration or admission of a fact); Black Diamond Collieries v. Deal (1924), 150 Tenn. 474, 265 S.W. 985; Hamilton National Bank v. Woods (1948), 34 Tenn.App. 360, 238 S.W.2d 109; Schultz, Banjan & Co. v. Bell (1939), 23 Tenn.App. 258, 130 S.W.2d 149.
*497 We also find it significant that it was Renzi, a non-party appraiser, who made the representation in question. In effect, Ceres is attempting to estop defendants from presenting evidence based upon the valuation arrived at and attested to by Neil Renzi who was not a party to either action. It is the statements of a party, however, which preclude later inconsistent statements under oath. As stated in Hild v. Avland Development Co. (1977), 46.Ill.App.3d 173, 181, 4 Ill.Dec. 672, 360 N.E.2d 785, "More important to us, however, is our inability to understand how a party to one lawsuit could swear to the untruth of a matter and then become party to another lawsuit and swear to the truth of the same matter." (Emphasis added.)
See also Finley v. Kesling, 105 Ill.App.3d at 9, 60 Ill.Dec. 874, 433 N.E.2d 1112 ("[h]aving affirmed under oath that a given state of facts exists, a party cannot be permitted to later affirm that the contrary is true").
On point is Department of Transportation v. Grawe (1983), 113 Ill.App.3d 336, 69 Ill. Dec. 250, 447 N.E.2d 467. There, the appellate court determined that a party was not judicially estopped from testifying that he was physically capable of performing his job in an action to recover that job even though he had offered the testimony of his physician at an earlier workman's compensation proceeding that he was in fact disabled. In declining to apply the doctrine, the appellate court stated that "the doctrine of judicial estoppel is inapplicable to statements made in the course of prior proceedings by witnesses for a party against whom the doctrine is sought to be asserted." Department of Transportation v. Grawe, 113 Ill.App.3d at 342, 69 Ill.Dec. 250, 447 N.E.2d 467.
Here, like Grawe, it was a non-party witness and not the party itself who made the statement upon which the estoppel is predicated. Consequently, defendants should not be precluded from offering evidence on the property's market value based on the prior representations made by Renzi. (Department of Transportation v. Grawe, 113 Ill. App.3d at 342, 69 Ill.Dec. 250, 447 N.E.2d 467; see also Louisville & Nashville R.R. Co. v. Johns (1958), 267 Ala. 261, 101 So.2d 265; Precluding Inconsistent Statements, 80 NW. Ill.Rev. at 1261 ("Considerations of equity, however, do not support application of the doctrine when it is a nonparty witness who is attempting to contradict an earlier position. If such a witness were estopped to assert a position, it would not be the witness who would suffer, but the party for whom he was testifying in the later proceeding. It is unjust to use judicial estoppel to penalize a party for the prior actions of his witness.")
There is also support for defendants' contention that the doctrine of judicial estoppel should not be applied in this instance because the representations in question were not made under oath. (Finley v. Kesling, 105 Ill.App.3d at 9, 60 Ill.Dec. 874, 433 N.E.2d 1112; see also Parisi v. Jenkins, 236 Ill. App.3d at 53, 177 Ill.Dec. 496, 603 N.E.2d 566.) We recognize that in Department of Transportation v. Coe (1983), 112 Ill.App.3d 506, 68 Ill.Dec. 58, 445 N.E.2d 506, the Fourth District discarded this "technical requirement," stating that this doctrine should apply in cases where the party "intended the trier to accept the truth of the party's position" regardless of whether the prior statement was made under oath. (112 Ill.App.3d at 510, 68 Ill.Dec. 58, 445 N.E.2d 506.) In so holding, the Coe court stated that:
"The requirement of a formal oath is a technical requirement and one which we decline to follow. Instead, we require that the record clearly reflect that the party intended the trier to accept the truth of the party's position. This requirement carries out the policies supporting the doctrine of judicial estoppel, without unduly restricting the doctrine.
Furthermore, application of the doctrine in administrative proceedings necessitates that the formal oath be eliminated. Administrative agencies today handle an enormous volume of proceedings and not all of those proceedings are conducted under formal oath. Often, disputes that arise in administrative proceedings find their way through administrative review to courts of law. It would be totally illogical to allow parties to take one position in an agency proceeding and then allow them to take an inconsistent position in subsequent *498 court proceedings simply because the first position was not taken under formal oath." Department of Transportation v. Coe, 112 Ill.App.3d at 510-11, 68 Ill.Dec. 58, 445 N.E.2d 506.
Notwithstanding Coe, as originally conceived in Hamilton v. Zimmerman (1857), 37 Tenn. 39, the doctrine of judicial estoppel was expressly based on the sanctity of the oath. This district has expressly stated that the doctrine of judicial estoppel is ground in the sanctity of the oath. As this court has explained:
"The doctrine of judicial estoppel rests upon public policy which upholds the sanctity of the oath [citation], and its purpose is to bar as evidence statements and declarations which would be contrary to sworn testimony the party has given in the same or previous judicial proceedings. [Citation.] Having affirmed under oath that a given state of facts exists, a party cannot be permitted to later affirm that the contrary is true." (Finley v. Kesling, 105 Ill.App.3d at 9, 60 Ill.Dec. 874, 433 N.E.2d 1112.)
(See Parisi v. Jenkins, 236 Ill.App.3d at 53, 177 Ill.Dec. 496, 603 N.E.2d 566; see also Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d at 1218 ("[i]n order to invoke judicial estoppel, a party must show that the opponent took a contrary position under oath in a prior proceeding and that the prior position was accepted by the court"); Precluding Inconsistent Statements, 80 NW.U.L.Rev. at 1253-55 (1986) (discussing the sanctity of the oath policy).) Although the application of the Coe court's relaxed oath requirement, and its corresponding rationale, would appear to have some merit, we reject Ceres' invitation to discard the oath requirement in its entirety at this juncture. To do so would constitute a departure from our own established precedent in Finley which squarely rests the application of this doctrine on the sanctity of the oath. (See Finley v. Kesling, 105 Ill. App.3d at 9, 60 Ill.Dec. 874, 433 N.E.2d 1112; see also Aetna Life Insurance Co. v. Wells (Tex.Civ.App.1977), 557 S.W.2d 144 (unsworn claims forms filed with Industrial Accident Board and unsworn statements made during the course of a prehearing conference did not give rise to judicial estoppel).) The oath factor should still remain an element for the trial court to consider in the exercise of its discretion (In re Cassidy, 892 F.2d at 642; Scott v. Land Span Motor, Inc., 781 F.Supp. at 1119), when determining whether the doctrine of judicial estoppel should be applied in a given instance.
Moreover, there is a discernable difference between the "market value" for tax purposes and the fair market value that the trial court sought to determine even though both purport to use a similar fair market standard. In this respect, we find persuasive cases where courts have rejected tax assessments as evidence of a property's fair market value. (Cook County v. Vulcan Materials Co. (1959), 16 Ill.2d 385,158 N.E.2d 12; see also Department of Transportation v. Prairie Travler, Inc. (1977), 52 Ill.App.3d 799, 10 Ill.Dec. 658, 368 N.E.2d 144.) In so doing, the Illinois Supreme Court has held that "statements of value for tax assessment purposes are inadmissible in condemnation proceedings on the issue of market value for the reason that they are not and do not purport to be statements of market value." (Cook County v. Vulcan Materials, 16 Ill.2d at 392, 158 N.E.2d 12.) Our supreme court has also recognized that:
"Citation of authority is unnecessary to support the proposition that the assessed value of real estate does not necessarily coincide with either its full and fair value or its market value. Moreover, the assessed value of real property is incompetent in determining its market value." Owens v. Green (1948), 400 Ill. 380, 394, 81 N.E.2d 149.
The foregoing distinction between assessed value and actual market value is consistent with the testimony that the Board is influenced by questions of uniformity in determining whether to reduce the property's assessed value. The desire for uniformity in order to equalize the tax burden for the claimant with that of the tax burden imposed on the comparable surrounding property is a consideration independent of the market value and would constitute a valid basis for reducing the assessed value. Kankakee County Board of Review v. Property Tax *499 Appeal Board (1989), 131 Ill.2d 1,136 Ill.Dec. 76, 544 N.E.2d 762; People ex rel. Tennyson v. Texas Co. (1950), 406 Ill. 120, 92 N.E.2d 142.
Although the aforementioned cases do not preclude the application of the doctrine of judicial estoppel, all of those cases are unequivocal in their determinations that valuation for tax assessment purposes is not coextensive with the valuation for determining the actual fair market value of the property. See also Department of Transportation v. Prairie Traveler, Inc., 52 Ill.App.3d at 803, 10 Ill.Dec. 658, 368 N.E.2d 144 (prohibiting use of inheritance tax return to establish actual value of property because of the differences in the standards of evaluation employed in the areas of eminent domain and inheritance taxation) and State v. Knapp (Tex.Civ.App. 1987), 740 S.W.2d 809, (party not judicially estopped from asserting a higher "market value" for land in eminent domain proceeding by his earlier representation of a lower "market value" in an inverse condemnation case where the nature of the taking and the resulting valuations were different). Consequently, we cannot say that the contentions and representations made in a tax forum regarding the proper assessment are fully coextensive with the factors that determine value for non-tax purposes. See Seattle-First National Bank v. Marshall (1982), 31 Wash.App. 339, 641 P.2d 1194 (party not estopped from asserting that partnership interest was more valuable than was established in earlier probate proceeding where the positions were not diametrically opposed).
As previously noted, we are mindful that the application of the doctrine of judicial estoppel is within the trial court's discretion. (See In re Cassidy, 892 F.2d at 641; Scott v. Land Span Motor, Inc., 781 F.Supp. at 1119.) In this respect we note that although this doctrine was designed and functions to protect the courts from unscrupulous litigants, an overbroad application would result in undesirable side-effects. (See Precluding Inconsistent Statements, 80 NW.U.L.Rev. at 1254-55 (1986).) At its core, this doctrine protects the integrity of the court system by precluding a party from asserting a particular position. The necessary corollary of the application of this doctrine, however, is that the trial court's role as fact finder is eliminated. (Levinson v. U.S. (7th Cir.1992), 969 F.2d 260.) Accordingly, courts have warned that the doctrine of judicial estoppel is "an extraordinary one which should be applied with caution [citation], because it `precludes a contradictory position without examining the truth of either statement.' [Citation.]" Scott v. Land Span Motor, Inc., 781 F.Supp. at 1119; Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d at 1218 ("judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement"); see also Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc. (4th Cir.1989), 892 F.2d 355.
We cannot say that in balancing the countervailing factors present in this case that the trial court's decision not to apply the doctrine of judicial estoppel amounted to an abuse of discretion. Ceres was attempting to estop defendants from offering any evidence as to the property's fair market value. Regardless of defendants' actions, the effect of applying the doctrine of judicial estoppel in this instance would be to allow Ceres to pay substantially less for its use of the property only because defendants filed a complaint before the Tax Board of Appeals. As stated by one court in the context of an eminent domain proceeding at which a condemnee sought to invoke the doctrine of judicial estoppel against a comdenor:
"Judicial estoppel barring the condemnor's evidence of diminished valuation may be too harsh a remedy for procedural misjudgment. It may cause the condemnor financial injury outstripping the financial peril to the condemnee. Estoppel is equitable; applied to readily it is harsh, rife with possibilities of a penalty outweighing the offense; it applies defensively only, never to give an unfair advantage to the party invoking it." People ex rel Department of Public Works v. Volz (1972), 25 Cal.App.3d 480, 488, 102 Cal.Rptr. 107.
Accord USLIFE Corp. v. U.S. Life Insurance Co. (N.D.Tex.1983), 560 F.Supp. at 1306 *500 ("[t]o estop a party from urging a position is an extreme measure which should only be taken where the equities are clearly in its favor"). See also Rowland v. Klies (1986), 223 Mont. 360, 726 P.2d 310, 315 ("`[although the rule ... may be regarded as a form of estoppel, it is not strictly one of estoppel, but partakes rather of positive rules of procedure based on manifest justice and, to a greater or lesser degree, on considerations of the orderliness, regularity, and expedition of litigation' [citation.]".) While these considerations may mitigate against the invocation of the doctrine as a complete bar, we note that the trial court did nevertheless expressly consider the representations before the Tax Board as evidence in evaluating the market value of the property.
B. Damages of Excess of the Appeal Bond
Ceres' next contention on appeal is that the trial court erred in awarding damages "which in no way can be ascribed to the stay order." Ceres argues that the stay order was the sole basis for the owners' rent claim and that the supersedeas bond which was submitted expressly limited Ceres' obligations. The supersedeas bond provided:
"We jointly and severally agree to pay Chicago City Bank and Trust Company, as trustee under trust number 10062, the amount of any judgment that may be entered herein or in cause number 79 L 19578 in the Circuit Court of Cook County upon a finding of damages sustained by Chicago City Bank and Trust Company, as trustee under trust number 10062, as a proximate result of the stay order entered in this cause on July 13, 1982."
We note at the outset that defendants did not recover any damages pursuant to the supersedeas bond, but rather proceeded on their amended complaint which sought rent and additional damages caused by Ceres' trespass and wrongful possession during the stay. Damages for wrongful possession properly include the fair rental value of the premises as well as other reasonably foreseeable costs that would not have been incurred but for such wrongful possession. Pleasure Driveway and Park Dist. v. Jones (1977), 51 Ill.App.3d 182, 9 Ill.Dec. 677, 367 N.E.2d 111; Ash v. Barrett (1971), 1 Ill.App.3d 414, 274 N.E.2d 149.
Furthermore, even if defendants had proceeded to seek enforcement of the supersedeas bond, that bond did not limit Ceres' liability for damages resulting from the stay. A supersedeas bond has no relevance to the potential liabilities of the principal, rather it only controls the limits of liability of the surety. In point is Rhodes v. Sigler (1976), 44 Ill.App.3d 375, 2 Ill.Dec. 626, 357 N.E.2d 846. There defendant, who was in possession of the land, appealed the trial court's judgment awarding possession of the land to the plaintiff. Defendant filed a $7,200 supersedeas bond to stay the execution of the judgment. Upon remand, the trial court awarded plaintiff $15,431 for the defendant's wrongful possession of the premises. On appeal, the court explained that the value of the bond was not a limitation on the defendant's liability, stating:
"[T]he amount of $7,200 which is set out as the limit of liability under the language in the supersedeas bond, while it would be determinative in respect to the extent of a surety's exposure, is not a limitation on the liability of the principal for restitution but is a condition imposed for supersedeas only. [Citation] An appeal bond is security for, but does not limit, the amount of the recovery." Rhodes v. Sigler, 44 Ill. App.3d at 379, 2 Ill.Dec. 626, 357 N.E.2d 846.
Ceres contends nevertheless that defendants are only entitled to those damages "proximately caused" by the stay. In this respect, Ceres argues that the trial court erred in awarding damages in the form of increased rent for property which was actually occupied by Scrap during the stay, and in awarding increased rent for the 2½ month period after the stay expired.
With respect to Scrap's use of the property, the trial court stated that Scrap "was purportedly occupying" some property leased by Ceres, but that "no specific figure" could be computed as to how much land was used. Ceres argues that in making such a determination, the trial court ignored Eileraas' uncontradicted testimony that Scrap was using *501 at least 20% of the land leased to Ceres to store its equipment as well as the exhibits in which Scrap admitted to using some of the land for storage.
We find this argument unavailing. The statements in the record by Eileraas are equivocal at best, stating that 20% was a "yardstick" of how much of the property Scrap was usingno definite amount was established. Moreover, there was evidence introduced at trial as to a reciprocal land-sharing relationship between Ceres and Scrap. Accordingly, we cannot say that the trial court's refusal to reduce the rent by a definite amount for the land "purportedly occupied" by Scrap was against the manifest weight of the evidence.
Contrary to Ceres, we also do not believe that the trial court erred in awarding increased rent for the 2½ month period after the appellate court mandate was issued. Ceres contends that defendants were not entitled to rent after the mandate issued because National Material, which then owned the property, did not object to Ceres continued occupancy and in fact accepted rent from it. According to Ceres, National Material's acceptance of rent without protest constituted a waiver of any right to claim additional rent. Ceres contends that National Material's available remedies were either to evict it as a tenant at sufferance or treat it as a holdover tenant under the terms of the expired lease.
These contentions ignore the fact that Ceres continued to occupy the land pursuant to a court order which expressly allowed defendants to accept rent from Ceres without any risk of waiving their right to seek increased rent in the future. At the time in question, defendant Chicago City Bank, which held legal title to the property, was expressly covered under the trial court's order permitting the acceptance of rent. Moreover, that National Material accepted rent without protest does not establish a holdover tenancy or indicate that the landlord is treating the former lessee as a holdover. (See Brach v. Amoco Oil Co. (N.D.Ill. 1983), 570 F.Supp. 1437 (holdover tenancy is not created by acceptance of rent payments where such acceptance is conditioned upon a right to contest other party's possession of the premises); see also Murphy v. Texaco, Inc. (N.D.Ill.1983), 567 F.Supp. 910; Sheraton-Chicago Corp. v. Lewis (1972), 8 Ill. App.3d 309, 290 N.E.2d 685 (acceptance of rent did not signal a decision to treat the former lessee as a holdover where circumstances indicated that lessor assumed that it was entitled to rent because the former lessee was still occupying property).) We also note that it would have been futile to require National Material to begin eviction proceedings in 1982 when Ceres was already occupying the land pursuant to a court order.
C. The Warehouses
Ceres' final contention on appeal is that the trial court erred in awarding $54,560 in damages as the cost of making interior repairs to the two warehouses on the property. The trial court found that the metal warehouse suffered $23,600 in damages and that the wooden warehouse suffered $30,900 in damages as a result of Ceres failure to make repairs. Ceres argues that defendants were not entitled to these damages because the repairs were never made and these damages did not diminish the fair market value of the property.
Generally, an "award of damages aims at compensating the injured party for damage to his property. [Citation.] The goal is to restore the party to the equivalent of his rightful pre-injury position." (Rittenhouse v. Tabor Grain Co. (1990), 203 Ill.App.3d 639, 650, 148 Ill.Dec. 958, 561 N.E.2d 264.) For actions like this one, the "[c]ost of repairs is merely a convenient way to quantify the damage a lessor has suffered." (Bowes v. Saks & Co. (7th Cir.1968), 397 F.2d 113,116.) This measure, however, should not be applied when it is unrelated to the damage suffered by the lessor. (Pennsylvania Cement Co. v. Bradley Contracting Co. (2d Cir.1926), 11 F.2d 687 (L. Hand, J.) (if cost of repair rule will give lessors a greater benefit than could be gained from full performance, a different measure of damages must be applied to avoid injustice).) As the Seventh Circuit stated:
"`In an action for breach of contract, as opposed to a suit sounding in specific performance, *502 the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages.' [Citation.] If the `cost of repair' rule will give lessors a greater benefit from the breach than could be gained from full performance, a different measure of damages must be applied to avoid injustice."
(Bowes, 397 F.2d at 116-17; see also Rosos Litho Supply Corp. v. Hansen (1984), 123 Ill.App.3d 290, 301, 78 Ill.Dec. 447, 462 N.E.2d 566 ("where the cost of repair is disproportionate to the benefit to plaintiff, the correct measure of damages is the amount by which the defective construction reduces the value of the property, unless the latter exceeds the former").) The purpose of this rule is to prevent windfall recoveries. Missouri Baptist Hospital v. United States (1977), 555 F.2d 290, 213 Ct.Cl. 505; see also Fayette R. Plumb, Inc. v. Cooper Industries, Inc. (E.D.Pa.1984), 587 F.Supp. 64, 65 ("recogniz[ing] the injustice that would result from a blind application of the cost of repair rule").
Exactly when the cost of repairs measure will apply and when the diminution of fair market value measure will apply is not clearly delineated under Illinois law. In some cases, Illinois courts have applied the cost of repairs rule regardless of the fluctuation of the property's fair market value. (See Peluso v. Singer General Precision, Inc. (1977), 47 Ill.App.3d 842, 855, 8 Ill.Dec. 152, 365 N.E.2d 390 ("[i]n Illinois, damages are generally measured by cost of repair, and not by diminution in value"); Peet v. Dolese and Shepard Co. (1963), 41 Ill.App.2d 358, 190 N.E.2d 613.) In other cases, Illinois courts have determined that the proper measure of damages is not the cost of repairs, but rather the diminution of the fair market value of the property. (See, e.g., Johnson v. Pagel Clikeman (1951), 343 Ill.App. 346, 99 N.E.2d 148; Peck v. Chicago Railways Co. (1915), 270 Ill. 34, 110 N.E. 414.
In Arras v. Columbia Quarry Co. (1977), 52 Ill.App.3d 560, 10 Ill.Dec. 192, 367 N.E.2d 580, the court noted the conflicting authorities and attempted to reconcile them. In so doing, it enunciated the following rule:
"`[I]n cases of injury to real estate or to that which has no value separate and apart from the real estate, the proper measure of damages is as follows: (1) if the injury is permanent, the measure of damages is the market value of the real estate before the injury, less the market value after the injury; (2) if the injury to the real estate is not permanent, then the measure of damages is the cost of restoration.'" Arras v. Columbia Quarry Co. (1977), 52 Ill.App.3d at 564-65, 10 Ill.Dec. 192, 367 N.E.2d 580.
Expounding on the groundwork established in Arras, the court in Williams-Bowman Rubber Co. v. Industrial Maintenance, Welding & Machining Co. (N.D.Ill.1987), 677 F.Supp. 539, determined that the distinction between permanent and temporary injuries turned, in least in large part, on the practicability of repairing the injuries in question. (677 F.Supp. at 545 n. 5 & n. 6.) The court concluded,
"If real property is partially injured, and the injury may be repaired in a practicable manner, then the proper measure of damages is the cost of restoring the property to its condition prior to the injury. If, however, the real property is totally destroyed or damaged in a manner which renders repair impracticable, then the diminution in value rule applies." Williams-Bowman Rubber Co. v. Industrial Maintenance, Welding & Machining Co., 677 F.Supp. at 545.
(See Matich v. Gerdes (1990), 193 Ill.App.3d 859,140 Ill.Dec. 737, 550 N.E.2d 622 (approving of Williams court formulation of rule).) See also Crystal Concrete Corp. v. Town of Braintree (1941), 309 Mass. 463, 35 N.E.2d 672, 675, where the court stated:
"The location and character of the demised premises must be considered; and the reasonable cost of repairs, in some instances, would furnish the proper measure of damages while, in other instances, the value of the premises may be such that the incurrence of expenses for repairs would not be *503 a reasonable, practical or economic method of dealing with the property."
Ceres asserts that defendants should not be able to recover the damages to the warehouses in light of the trial court's express finding that the "repairs or maintenance that may have been the responsibility of the tenant during the effective period of Ceres' lease and which were not performed, did not cause any damage to or diminution in value of the subject property."
We disagree with Ceres' argument with respect to the interior damages to the metal warehouse. The metal warehouse is still functional and in use and the repairs are capable of being made. In such an instance, it is the cost of repairs that is the proper measure of damages, not the diminution in the fair market value of the property. (See Williams; Arras.) The adoption of the decrease in fair market value of the property measure in this case would be inconsistent with the general rule as summarized above and would serve to stifle the recovery of appropriate damages in the name of preventing windfalls when such repairs are appropriate and practicable.
We do think, however, that the trial court erred in awarding the $30,900 in damages for the wooden warehouse. The necessary interior repairs to the wooden warehouse were never made and the building has since been torn down. As such, defendants have not suffered any expenditures as a result of Ceres failure to make the repairs in question. Because the warehouse has since been demolished, any damages recovered could not be put towards making the necessary repairs. To allow recovery in this case, would require some indication of an injury in the form of a diminution in the fair market value of the property. The trial court, however, expressly found that the damages to the wooden warehouse did not result in any diminution of the property's fair market value.
On point is Associated Stations, Inc. v. Cedars Realty & Development Corp. (4th Cir.1972), 454 F.2d 184, 189-90, where the court denied plaintiff recovery for the replacement cost of electrical wiring. It stated:
"If Associated were to recover also $27,500.00 as the estimated cost of replacement of the electrical wiring which Associated has no intention of replacing and which would have no effect on the market value of the property, Associated would realize a windfall of $27,500.00. Since, this is the case, the use of the `cost of restoration' method of determining damages would probably do more than place Associated in the position it would have been in had Cedars not breached its agreement, we think that the use of this method inappropriate. Rather, Associated should be permitted to recover cost of restoration or the diminution in market value, whichever is less."
Likewise, in this case, defendants did not make the repairs in question. As such, the diminution of the property's fair market value is the proper measure. (See 3-9 West Ontario Building Corp. v. Palmer Truck Leasing Co. (1974), 22 Ill.App.3d 467, 317 N.E.2d 740.) Here, the trial court's express and unequivocal finding that there was no such diminution of the fair market value controls. That finding is supported by the evidence which showed that the wooden warehouse was uninhabitable during the period of the stay and McCann's testimony that the wooden warehouse should probably be destroyed rather than repaired. In light of these circumstances, we conclude that the trial court erred in awarding damages for the wooden warehouse. This application of this rule is consistent with the nature of compensatory damages which seeks to compensate the injured party without penalizing the party who is liable. See Williams-Bowman Rubber Co. v. Industrial Maintenance, Welding & Machining Co., 677 F.Supp. at 545; see also First National Bank of Elgin v. Dusold (1989), 180 Ill.App.3d 714, 129 Ill. Dec. 416, 536 N.E.2d 100 (rejecting replacement cost as measure of damages in action seeking to recover damages to residence and appliances therein where such recovery would give plaintiff a windfall).

*504 DEFENDANT'S CROSS-APPEAL
In their cross-appeal, defendants argue that the trial court erred by failing to include the expense of the property taxes in establishing Ceres' liability for the amount of rent owed for the February 1, 1982, through March 15, 1984, period. They also challenge the trial court's reduction of the usable acreage occupied by Ceres from 16 to 11 acres and contend that its valuation of the subject property at $1,400,000 did not reflect the evidence presented at trial.
In each of these instances, defendants are attacking factual findings made by the trial court. Consequently, the trial court's determination of these issues will not be reversed unless against the manifest weight of the evidence. National R.R. Passenger Corp. v. Crown-Trygg Corp. (1988), 170 Ill.App.3d 946, 120 Ill.Dec. 772, 524 N.E.2d 954; Chicago City Bank & Trust Co. v. Ceres Terminals, Inc. (1981), 93 Ill.App.3d 623, 49 Ill.Dec. 108, 417 N.E.2d 798.
We first address defendants' contention that the trial court erred by failing to include the expense of property taxes in computing Ceres' liability. The trial court computed Ceres' liability for increased rent as follows:
"A fair rate of return on the Subject Property used and occupied by Ceres from February 1, 1982, through March 15, 1984, is found to be 12%. $1,400,000 [the fair market value of the property as determined by the court] multiplied by 12% entitles the counterplaintiffs to $168,000 in annual rental of $14,000 per month."
Defendants contend that this computation erroneously ignored McCann's uncontradicted testimony which established that the proper rate of return was a 12% "net" rate of return on the fair market value of the property. They contend that McCann's testimony established that under such a rate of return, it was the tenant who bore the expense of the property taxes.
Ceres counters that it is well established that the owner of land is obligated to pay all real estate taxes and can shift its tax liability to the lessee only if there is a clear agreement to that effect. (City of Chicago v. Chicago City Bank & Trust Co. (1984), 129 Ill.App.3d 410, 84 Ill.Dec. 690, 472 N.E.2d 827; Metropolitan Airport Authority of Rock Island County v. Farliza Corp. (1977), 50 Ill.App.3d 994, 8 Ill.Dec. 950, 366 N.E.2d 112.) The trial court agreed with Ceres' position on the grounds that the period in question was not covered by the lease which expired as of January 31, 1982, and which would have required by its terms that the property tax burden shift to Ceres.[3]
The question before us, however, is not one of tax shifting or of which party is legally obligated to pay the taxes on the property. Defendants as the owners of the property must pay those taxes. (City of Chicago v. Chicago City Bank & Trust Co.) Rather, the question before us concerns the appropriate rate of return to the owners. That there is no agreement between the parties is irrelevant to the appropriate amount of rent which is to be paid in this instance as defendants' action is based in tort, not on a contract.
Here, McCann did testify that "a 12% net rate" was appropriate and that under a net rental the tenant bore the expenses for the property, including real estate taxes. McCann's testimony on the propriety of a "12% net" rate of return, however, does not in and of itself mandate that Ceres bear the burden of the property taxes in this instance.
The trial court was free to consider other non-testimonial evidence before it in determining the appropriate rate of return. In this respect we note that under the 1957 lease defendants bore the burden for "all general taxes, special assessments, and charges against the demised premises." Furthermore, under the lease option period (1977-1982), which covered the span of time *505 immediately prior to the period at issue, the rate of return was established at 5%. This rate of return did not include the expense of the property taxes which were to be bore by the defendants. Chicago City Bank & Trust v. Ceres Terminals, 93 Ill.App.3d at 632-33, 49 Ill.Dec. 108, 417 N.E.2d 798.
Although the lease option provision does not govern, it does provide evidence of the appropriate rate of return for the period immediately preceding the stay for the same property. McCann's testimony concerning a 12% "net" rate did not mandate that the trial court disregard this other evidence of the appropriate rate of return. (See City of Chicago v. Illinois Commerce Comm'n (1985), 133 Ill.App.3d 435, 88 Ill.Dec. 643, 478 N.E.2d 1369 (Illinois Commerce Commission's conclusion that a 6% rate of inflation was proper in computing oil prices was supported by the evidence even where there was testimony presented that those prices would not increase at all).) The trial court's determination of a 12% rate of return which did not include a shift in the payment of the property taxes was within the range of evidence established by McCann's testimony and the prior rate of return received by defendant on the same property for the period immediately preceding that at issue. See Kassnel v. Village of Rosemont (1985), 135 Ill.App.3d 361, 371, 90 Ill.Dec. 49, 481 N.E.2d 849 (a "reviewing court will not disturb an award * * * which is within the range of evidence unless that award can be attributed to passion, prejudice or clear mistake").
In light of this evidence, we cannot say that the trial court's finding with respect to the rate of return was against the manifest weight of the evidence. See City of Chicago v. Illinois Commerce Comm'n, 133 Ill.App.3d at 440, 88 Ill.Dec. 643, 478 N.E.2d 1369 (Illinois Commerce Commission's use of a 6% rate of inflation was not reversible error since that rate was within the range of evidence presented; there was some testimony that prices would not increase at all and other testimony that the appropriate rate would be 9%).
Defendants next contend that the trial court erred in valuing the subject property at $1,400,000 and in reducing the amount of useable acreage occupied by Ceres from 16 to 11 acres. With respect to the valuation of the property, defendants argue that McCann's testimony which appraised the property at $1,829,000, and Judge Dunne's valuation of $1,850,000 coupled with testimony that the value of the property remained stable since that ruling, established that the property had a market value greater than $1,400,000.
Likewise here too, contrary to defendants' contention, the trial court's valuation of the property was not against the manifest weight of the evidence. In making its decision, the trial court expressly considered McCann's testimony, Judge Dunne's valuation of the property as of 1977-82 period, and the witness testimony attesting that the value of the property had not decreased. In addition to these factors, however, the trial court also expressly considered the evidence of valuation that was presented before the Tax Board in 1982 and 1983, including Neil Renzi's appraisal valuing the property at $1,020,000, and that the entire 38-acre tract was sold for $1.3 million in 1982.
As already noted, in cases where the trier of fact's determination of a property's value falls within the range of values established by the evidence, that valuation will not ordinarily be overturned on appeal unless that determination can be attributed to passion, prejudice or clear and palpable mistake. Illinois State Toll Highway Authority v. Dicke (1991), 208 Ill.App.3d 158, 153 Ill.Dec. 153, 566 N.E.2d 1003; Kassnel v. Village of Rosemont, 135 Ill.App.3d at 371, 90 Ill.Dec. 49, 481 N.E.2d 849; see also In re Marriage of Olson (1992), 223 Ill.App.3d 636, 166 Ill. Dec. 60, 585 N.E.2d 1082.
In this case, the trial court's valuation of $1,400,000 unquestionably falls within the range of differing values established by the evidence. There being no indication of any passion, prejudice, or palpable mistake on the part of the trier of fact, we have no reason to overturn the trial court's determination. See Chicago City Bank & Trust Co. v. Ceres Terminals, Inc. (1981), 93 Ill.App.3d 623, 49 Ill.Dec. 108, 417 N.E.2d 798 (finding that the trial court's valuation of the same *506 property at issue here was not against the manifest weight of the evidence where it did not adopt a valuation set forth by any one of three testifying appraisers, but instead reached its own figure as to the property's value which was within the range established by the testimony of the appraisers); see also In re Marriage of Hunter (1992), 223 Ill. App.3d 947,166 Ill.Dec. 242, 585 N.E.2d 1264 (trial court's determination that husbands business was worth $55,000 was not against the manifest weight where husband testified business was worth between $32,000 and $37,000 and wife's expert testified that business was worth $90,000); In re Marriage of Melnick (1984), 127 Ill.App.3d 102, 82 Ill.Dec. 228,468 N.E.2d 490 (trial judge's valuation of stock in closely held corporation at $35 per share was not against the manifest weight of the evidence where trial court was presented with evidence which established a range of value from $3.83 to $108.83 per share).
Defendants' final contention in their cross-appeal is that the trial judge erred in reducing the acreage occupied by Ceres. Specifically, defendants contend that the trial court erred when it reduced the acreage by 2.3 acres to reflect the area covered by the part of the railroad easement which was on property leased to Ceres. They argue that McCann's valuation specifically included the area covered by the easement which, according to McCann, actually increased the value of the property. They contend that the trial court also erred in reducing the acreage by 1.8 acres for the area covered by the wooden warehouse because the market value should properly reflect the highest and best use of the property regardless of the condition of any improvement upon it. With respect to the 1.5 acres that the trial court found to be now underwater, the defendants assert that there was no evidence to support that finding.
The trial court's reduction of the usable acreage occupied is not against the manifest weight of the evidence. First, the existence and size of the railroad easement remained undisputed. Defendants' assertion that the easement actually enhanced the value of the property is not binding on the trier of fact.
The land encumbered by the easement was of limited use to Ceres. The benefit of the railroad spur would have been reflected in the estimated value of the surrounding area for which Ceres was required to pay rent. Consequently, as a tenant, Ceres would have been effectively subject to duplicate rent liability if it were required to pay for the land underneath the easement as well when that land was unusable and the value of the easement itself was calculated in the rent for the adjacent land. In fact, Kunkel acknowledged that the amount of acreage covered by an easement could be considered unusable requiring a corresponding reduction in the amount of usable acreage.
With respect to the wooden warehouse, it was established at trial that Ceres was unable to use that warehouse to store goods because of the leaky roof which was defendant's duty to maintain under the provisions of the lease. Ceres received complaints and claims from customers with respect to freight which had been damaged as a result of its stay in the warehouse. Even McCann testified that it was not suitable for use as a warehouse and that demolition might be preferable to repair. In light of this evidence, we cannot say that the trial court's decision to reduce the amount of useable acreage by the area occupied by the warehouse was against the manifest weight of the evidence. While the land underneath the wooden warehouse may be valued at its highest or best use, it would not be reasonable to charge such value for the use of that land where such land is rendered unusable by the presence of an unusable improvement.
Finally, we address defendants' claim that the trial court erred in reducing the usable acreage by 1.5 acres for land which was underwater. A survey of the subject property which was submitted to the trial court indicates that approximately 1.5 acres of land was underwater as the result of dock construction. McCann's own testimony established that this fact would reduce the value of the property. We therefore conclude that the trial court's decision reducing the amount of useable acreage from 16 to 11 acres was not against the manifest weight of the evidence. Waste Management of Illinois, *507 nois, Inc. v. Pollution Control Board (1989), 187 Ill.App.3d 79, 135 Ill.Dec. 122, 543 N.E.2d 505; Ash v. Barrett (1971), 1 Ill. App.3d 414, 274 N.E.2d 149.
For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part.
Judgment Affirmed in Part and Reversed in Part.
McNULTY and COUSINS[*], JJ., concur.
NOTES
[1] The owners had previously filed complaints in 1975 and 1976 with the Board of Tax Appeals seeking an assessment reduction. In 1975 and 1976, the owners claimed that the value of the property in question was $1,000,000. In both 1975 and 1976, the assessed valuation was reduced to reflect the reduced market value of $1,000,000 as claimed for the entire 32-acre property.
[2] As such, judicial estoppel is distinct from the related doctrines of collateral estoppel, equitable estoppel and res judicata, where the identity of the party invoking the estoppel or the fact that the court has entered a final judgment on a claim that has been again raised is relevant. (See Comment, Judicial Estoppel: The Refurbishing of a Judicial Shield, 55 Geo.Wash.L.Rev. 409, 414-16 (1987); see also USLIFE Corp. v. U.S. Life Insurance Co. (N.D.Tex. 1983), 560 F.Supp. 1302, 1304-05). The "gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts the judicial machinery." (Comment, Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel, 80 NW. U.L.Rev. 1244, 1249 (1986); see also Teledyne Industries, Inc. v. N.L.R.B. (6th Cir.1990), 911 F.2d 1214.
[3] While the trial court seemed to be under the impression that the pre-existing lease which allowed for a "net" return would have shifted the burden of the property taxes to Ceres, such an interpretation would be inconsistent with the appellate court's decision in Chicago City Bank and Trust v. Ceres Terminals, where the court determined that defendants bore the burden of the property taxes under that lease notwithstanding the "net" return language. 93 Ill.App.3d at 632-33, 49 Ill.Dec. 108, 417 N.E.2d 798.
[*] Justice MURRAY heard oral argument in this appeal. Upon his recusal Jusitce McNULTY substituted in the decision of this appeal. She has read the briefs and listened to the tape of the oral argument.